[L.A. No. 30904. Aug. 23, 1979.]

FAIR POLITICAL PRACTICES COMMISSION, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
INSTITUTE OF GOVERNMENTAL ADVOCATES et al.,
Real Parties in Interest.

## Counsel

Daniel H. Lowenstein, Robert M. Stern, Michael J. Baker and Lee C. Rosenthal for Petitioner.

Kenneth J. Guido, Jr., Roger Jon Diamond, Hecht, Diamond & Greenfield and John W. Black as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, Floyd D. Shimomura, Deputy Attorney General, Ball, Hunt, Hart, Brown & Baerwitz, John R. McDonough, Laurence F. Jay and Allan E. Tebbetts for Real Parties in Interest.

Ruth M. Simon, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

CLARK, J.—The Fair Political Practices Commission petitions for writ of mandate to compel respondent court to vacate a judgment enjoining enforcement of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.), an initiative measure.

We have stayed enforcement of the judgment except for paragraph 5, "That intervenor Fair Political Practices Commission . . . [is] permanently enjoined from commencing proceedings as civil prosecutor against any lobbyist based on the single act of advising or making a recommendation to the employer of the lobbyist with regard to the making of a political contribution where the advice or recommendation results in a contribution from the employer." This provision made permanent a preliminary injunction issued in 1975 by Judge Hupp of the superior court, and affirmed in *Institute of Governmental Advocates* v. *Younger* (1977) 70 Cal.App.3d 878 [139 Cal.Rptr. 233].

Respondent court declared the entire initiative invalid, holding it violates the one subject rule applicable to initiatives (Cal.Const., art. II, § 8, subd. (d), formerly art. IV, § 22); section 86202 of chapter 6 (prohibiting lobbyist contributions to political campaigns) violates First Amendment and equal protection guarantees; and, with minor exceptions, the remainder of chapter 6 violates equal protection guarantees. Sections of chapter 6 declared invalid include limitations on lobbyist gifts to certain public officials, and disclosure requirements for certain persons and organizations involved with lobbying.

## THE SINGLE SUBJECT RULE

The initiative concerns elections and different methods for preventing corruption and undue influence in political campaigns and governmental activities. Chapters 1 and 2 contain general provisions and definitions, including a severability provision. Chapter 3 establishes the commission. Chapter 4 establishes disclosure requirements for candidates' significant financial supporters. Chapter 5 places limitations on campaign spending. Chapter 6 regulates lobbyist activities. Chapter 7 establishes rules relating to conflict of interest. Chapter 8 establishes rules relating to voter pamphlet summaries of arguments on proposed ballot measures. Chapter 9 regulates ballot position of candidates. Chapter 10 establishes auditing procedures to aid enforcement of the law, and chapter 11 imposes penalties for violations of the act.

Several sections of the initiative have been held invalid in prior decisions. Under the compulsion of *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612], we held sections 85300-85305 limiting expenditures on statewide ballot propositions violated the freedom of speech guarantee of the First Amendment to the United States Constitution. (*Citizens for Jobs & Energy* v. *Fair Political Practices Com.* (1976) 16 Cal.3d 671 [129 Cal.Rptr. 106, 547 P.2d 1386].) In *Hardie* v. *Eu* (1976) 18 Cal.3d 371 [134 Cal.Rptr. 201, 556 P.2d 301], we concluded Government Code sections 85200-85202 limiting the amount to be expended for circulation of initiative petitions was in conflict with First Amendment guarantees, again relying on *Buckley*. In *Institute of Governmental Advocates* v. *Younger, supra,* 70 Cal.App.3d 878, the Court of Appeal held that a commission ruling precluding lobbyists from advising their employers to make political contributions violated First Amendment guarantees.

The California Constitution, article II, section 8, subdivision (d), states: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."

The single subject requirement for initiative measures was adopted in 1948 as article IV, section 1c. The next year this court in *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 92-93 [207 P.2d 47], construed the provision as follows: "The problem of whether more than one subject is embraced within one legislative act is not new in this state. Although section 1c has been newly added extending the requirement to initiative constitutional amendments, the Constitution for many years has required that 'Every act shall embrace but one subject, which subject shall be expressed in its title.' (Cal.Const., art. IV, § 24.) The proper scope and application of that provision as to singleness of subject was elucidated, as the latest word on the subject, by this court in *Evans* v. *Superior Court,* 215 Cal. 58, 62 [8 P.2d 467], upholding the adoption of the Probate Code in a single enactment: '. . . we are of the view that the provision is not to receive a narrow or technical construction in all cases, but is to be construed liberally to uphold proper legislation, all parts of which are reasonably germane. (*Heron* v. *Riley,* 209 Cal. 507, 510 [289 P. 160].) The provision was not enacted to provide means for the overthrow of legitimate legislation. (*McClure* v. *Riley,* 198 Cal. 23, 26 [243 P. 429].) . . . [¶] Numerous provisions, having one general object, if fairly indicated in the title, may be united in one act. Provisions governing projects so related and interdependent as to constitute a single scheme may be properly included within a single act. (*Barber* v. *Galloway,* 195 Cal. 1, 3 [231 P.

34].) The legislature may insert in a single act all legislation germane to the general subject as expressed in its title and within the field of legislation suggested thereby. (*Treat* v. *Los Angeles Gas Corp.,* 82 Cal.App. 610 [256 P. 447].) Provisions which are logically germane to the title of the act, and are included within its scope, may be united. The general purpose of a statute being declared, the details provided for its accomplishment will be regarded as necessary incidents. (*Estate of Wellings,* 192 Cal. 506, 519 [221 P. 628]; *Buelke* v. *Levenstadt,* 190 Cal. 684, 687 [214 P. 42]; and cases cited.) The language of this court in *Robinson* v. *Kerrigan,* 151 Cal. 40, 51 [121 Am.St.Rep. 90, 12 Ann.Cas. 829, 90 P. 129], is especially applicable to this case at this point. A provision which conduces to the act, or which is auxiliary to and promotive of its main purpose, or has a necessary and natural connection with such purpose is germane within the rule. . . . Our conclusion, therefore, is that the newly enacted Probate Code does not embrace more than one subject. Its numerous provisions have one general object. The classification of these provisions, made by the code commission, and carried into the title of the act, is a "reasonably intelligent reference to the subject to which the legislation of the act is to be addressed," which is all that is requisite.' (See, also, cases collected in 23 Cal.Jur. 646-650; 50 Am.Jur., Statutes, §§ 196-199.) When the scope and meaning of words or phrases in a statute have been repeatedly interpreted by the courts, there is some indication that the use of them in a subsequent statute in a similar setting carries with it a like construction. (*City of Long Beach* v. *Payne,* 3 Cal.2d 184 [44 P.2d 305].) There is nothing in the argument to the voters when section 1c of article IV was adopted contrary to such construction or the purposes underlying the 'one subject' limitation."

Relying upon *Perry* v. *Jordan,* this court applied the reasonably germane test and upheld the California Water Resources Development Bond Act in *Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 172-173 [28 Cal.Rptr. 724, 379 P.2d 28]. The act provided for issuance of nearly $2 billion in bonds, the proceeds to be used for dams, levees, channel improvements, a water distribution system, drainage facilities, electrical energy generation and transmission systems, and local water development facilities.

Recently, we rejected a claim that the one subject requirement was violated by an initiative limiting real property tax rates, limiting real property assessments, restricting state taxes, and restricting local taxes. (Cal. Const., art. XIII A; the Jarvis-Gann Initiative.) We held that all provisions were functionally related and reasonably germane to the

subject of property tax relief. (*Amador Valley Joint Union High Schl. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].)[1]

Real party in interest Institute of Governmental Advocates (Advocates) argues that a more restrictive test should be applied in determining compliance with the one subject requirement applicable to initiatives than to the same requirement applicable to legislation. Two reasons are offered for a more restrictive test: the lengthy ballot propositions, having numerous provisions, will mislead and confuse the voter, and danger exists that voters wanting one or more of the provisions offered might vote for the proposition even though they reject other provisions—a danger of so-called "log rolling." (See *Schmitz* v. *Younger* (1978) 21 Cal.3d 90, 93, 97 et seq. (dis. opn.) [145 Cal.Rptr. 517, 577 P.2d 652].)

Advocates does not articulate a particular test to replace the reasonably germane test. Rather, Advocates takes the position that the reasons for a more restrictive test necessarily provide the measure of such test. Advocates claims both reasons apply to the Political Reform Act of 1974, asserting the initiative is lengthy and confusing—containing more than 20,000 words and numerous interrelated provisions—and that it involves four wholly separate substantive subjects: (1) regulation of election to public office, (2) regulation of ballot measure petitions and elections, (3) regulation of public official conflicts of interest, and (4) regulation of lobbyists.[2]

---

[1]A Michigan statute adopted by the Legislature—containing provisions similar to those before us—was held to violate the one subject requirement. (*In re Advisory Opinion (Being 1975 PA 227)* (1976) 396 Mich. 123 [240 N.W.2d 193].) As an alternate ground of decision, the Washington Supreme Court held that a similar initiative involved only a single subject. (*Fritz* v. *Gorton* (1974) 83 Wn.2d 275 [517 P.2d 911, 920-921].)

[2]Each of the four headings is further broken down as follows: "1. *Regulation of election to public office.* The provisions of the Act dealing with this subject include regulations pertaining to: [¶] Campaign committee organization (§§ 84100-84103). [¶] Required reporting of campaign contributions and expenditures (§§ 84200-84214). [¶] Limitations upon campaign contributions (§§ 84300-84304). [¶] Requirements respecting mass mailings (§ 84305). [¶] Limitation of campaign expenditures by statewide candidates (§§ 85100-85108 [later repealed]). [¶] Regulation of the position of candidates on the ballot (§ 89000). [¶] Prohibition of sending of legislative newsletters or other mass mailings at public expense on behalf of any elected state officer after he has filed a declaration of candidacy (§ 89001). [¶] 2. *Regulation of ballot measure petitions and elections.* The provisions of the Act dealing with this subject include regulations pertaining to [¶] Campaign committee organization (§§ 84100-84103). [¶] Required reporting of ballot measure campaign contributions and expenditures (§§ 84200-84214). [¶] Limitation of expenditures in furtherance of circulation and qualification of statewide petitions (§§ 85200-85202 [later repealed]). [¶] Information required to appear on statewide petitions (§ 86203 [later repealed]). [¶] *Limitation of expenditures for or against*

▮ Consistent with our duty to uphold the people's right to initiative process, we adhere to the reasonably germane test and, in doing so, find that the measure before us complies with the one subject requirement.

"The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it 'the duty of the courts to jealously guard this right of the people' (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]), the courts have described the initiative and referendum as articulating 'one of the most precious rights of our democratic process' (*Mervynne* v. *Acker,* . . . 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340]). '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563-564; *Gayle* v. *Hamm,* . . . 25 Cal.App.3d 250, 258 [101 Cal.Rptr. 628].)" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038] (fns. omitted); *Farley* v. *Healey* (1967) 67 Cal.2d 325, 328 [62 Cal.Rptr. 26, 431 P.2d 650].)

In keeping with the policy favoring the initiative, the voters may not be limited to brief general statements but may deal comprehensively and in detail with an area of law.

---

adoption of state ballot measures (§§ 85300-85305 [later repealed]). [¶] Requirements as to form and content of State ballot pamphlet (§§ 88001-88002, 88004-88005). [¶] Duties of Secretary of State, Legislative Analyst and Legislative Counsel regarding State ballot pamphlet (§§ 88000, 88003, 88005.5). [¶] Right of public to examine State ballot pamphlet prior to printing; judicial review of ballot pamphlet prior to printing (§ 88006). [¶] 3. *Regulation of public official conflicts of interest.* The provisions of the Act dealing with this subject include regulations pertaining to [¶] Prohibition of actions by a public official to influence governmental decisions in which he has a financial interest (§§ 87100-87103). [¶] Required disclosure by public officials of investments and interests in real property (§§ 87200-87207). [¶] Mandatory adoption of conflict of interest codes by state agencies and local governmental agencies (§§ 87300-87312). [¶] 4. *Regulation of lobbyists.* The provisions of the Act dealing with this subject include regulations pertaining to [¶] Registration of lobbyists (§§ 86100-86104). [¶] Accounts required to be established and maintained by lobbyists (§§ 86105-86106). [¶] Reporting of receipts and expenditures by lobbyists (§ 86107). [¶] Prohibition of campaign contributions and limitations of gifts by lobbyists (§§ 86202, 86203). [¶] Other prohibitions imposed upon lobbyists regarding the practice of their profession (§ 86205)."

Although the initiative measure before us is wordy and complex, there is little reason to expect that claimed voter confusion could be eliminated or substantially reduced by dividing the measure into four or ten separate propositions. Our society being complex, the rules governing it whether adopted by legislation or initiative will necessarily be complex. Unless we are to repudiate or cripple use of the initiative, risk of confusion must be borne.

Nor does the possibility that some voters might vote for the measure —while objecting to some parts—warrant rejection of the reasonably germane test. Such risk is inherent in any initiative containing more than one sentence or even an "and" in a single sentence unless the provisions are redundant. For example, the Jarvis-Gann initiative (Cal. Const., art. XIII A) provided limitations on property taxes and restrictions on state and other local taxes. (See *Amador Valley Joint Union High Schl. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208.) Some property owners may have voted for the measure primarily because of the property tax relief, while having questions about the state and other local tax restrictions. Similarly, some nonproperty owners may have voted for the initiative primarily because of the restrictions on other state and local taxes, while having reservations as to the property tax limitations.

The enactment of laws whether by the Legislature or by the voters in the last analysis always presents the issue whether on balance the proposed act's benefits exceed its shortcomings. If so, the remedy for shortcomings is repeal, which will be difficult whether the law is adopted by the Legislature or the people. The difficulty of repeal is merely one factor to be considered by legislators and voters when casting their votes.

Given the widespread public debate of initiatives, the explanations in the ballot pamphlets and in the media, and the huge volume of legislative business—over 1,000 bills enacted each year—it is unreasonable to assume that initiative measures receive less scrutiny than proposed legislation.

■ The people having reserved the legislative power to themselves as well as having granted it to the Legislature, there is no reason to hold that the people's power is more limited than that of the Legislature, and the single subject requirements applicable to both powers (Cal. Const., art. II, § 8, subd. (d); art. IV, § 9) should not be used to establish inequality. (Cf. *Associated Home Builders etc. Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 591-592.) Accordingly, we adhere to the reasonably germane test for both.

 The provisions of the initiative are reasonably germane to the subject of political practices, and there is no violation of the one subject requirement.

## LOBBYIST REGULATION

A. *Contributions*

Section 86202 provides: "It shall be unlawful for a lobbyist to make a contribution, or to act as an agent or intermediary in the making of any contribution, or to arrange for the making of any contribution by himself or by any other person." "Contribution" means a "contribution made to a state candidate, a committee supporting a state candidate, or an elected state officer." (§ 86200.) " 'Lobbyist' means any person who is employed or contracts for economic consideration, other than reimbursement for reasonable travel expenses, to communicate directly or through his agents with any elective state official, agency official or legislative official for the purpose of influencing legislative or administrative action, if a substantial or regular portion of the activities for which he receives consideration is for the purpose of influencing legislative or administrative action. No person is a lobbyist by reason of activities described in Section 86300."[3] (§ 82039.) There is no prohibition against contributions by employers of lobbyists.

In *Institute of Governmental Advocates* v. *Younger, supra,* 70 Cal.App.3d 878, as pointed out earlier, the Court of Appeal on First Amendment grounds invalidated a commission ruling based on section 86202, precluding lobbyists from advising their employers to make political contributions.

In *Buckley* v. *Valeo, supra,* 424 U.S. 1, 23-38 [46 L.Ed.2d 659, 690-699], the United States Supreme Court considered the validity of provisions of the Federal Election Campaign Act of 1971 as amended limiting the amount of political contribution by individuals to $1,000 for any candidate and $25,000 total. The court held that contribution limitations restrict the contributor's freedom of association, "a 'basic constitutional freedom,' *Kusper* v. *Pontikes,* 414 U.S. at 57, that is 'closely allied to freedom of speech and a right which, like free speech, lies at the

---

[3]Section 86300 exempts certain activities of governmental officials and employees, the media, and church representatives.

foundation of a free society.' *Shelton* v. *Tucker*, 364 U.S. 479, 486 (1960). See, e.g., *Bates* v. *Little Rock*, 361 U.S. 516, 522-523 (1960); *NAACP* v. *Alabama, supra*, at 460-461; *NAACP* v. *Button, supra*, [371 U.S.] at 452 (Harlan, J., dissenting)." (424 U.S. at p. 25 [46 L.Ed.2d at p. 691].)

The court pointed out that under our system of private financing of elections, effective candidacy requires large sums of money for the communication media and mass mailing to allow effective discussion of candidacies and campaign issues. (424 U.S. at pp. 26-29 [46 L.Ed.2d at pp. 691-694].) It is apparent that unless an individual is permitted to participate in the election by contributing to candidates, his political voice may be quieted.

The right to associate being fundamental, any governmental action in curtailment of it " 'is subject to the closest scrutiny.' " Recognizing that the right is not absolute, the court said that significant interference may be sustained if the "State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." (424 U.S. at p. 25 [46 L.Ed.2d at p. 691].)

The court concluded that the government's interest in limiting actual or apparent corruption resulting from large individual political *contributions* is sufficient justification for restricting associational freedoms and the limitation "focuses precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified." (424 U.S. at pp. 24-29 [46 L.Ed.2d at pp. 690-694].) However, the court also concluded the governmental interest in preventing corruption and its appearance is insufficient justification for limitations on political *expenditures*. (424 U.S. at pp. 45-47 [46 L.Ed.2d at pp. 702-704]; *Hardie* v. *Eu, supra*, 18 Cal.3d 371, 377; *Citizens for Jobs & Energy* v. *Fair Political Practices Com., supra*, 16 Cal.3d 671, 674-675.)

A sufficiently compelling governmental interest justifying substantial interference with political rights was also found in *CSC* v. *Letter Carriers* (1973) 413 U.S. 548 [37 L.Ed.2d 796, 93 S.Ct. 2880]. Upholding the Hatch Act limiting political activity of governmental employees, the court identified three governmental interests that could be harmed if governmental employees could participate publicly in political activities: (1) governmental employment and promotion might depend upon the extent of participation rather than governmental efficiency, (2) the large number

of governmental employees might become a huge political machine defeating our democratic processes, and (3) partisan political activity might impair the employee's ability to act fairly without bias or favoritism. (413 U.S. at pp. 564-567 [37 L.Ed.2d at pp. 808-810].)

Obviously, the prohibition against lobbyist contributions in section 86200 is a substantial restriction on the lobbyists' freedom of association, and the restriction may be upheld only if the "State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." (*Buckley* v. *Valeo, supra,* 424 U.S. 1, 25 [46 L.Ed.2d 659, 691].) The statute fails to meet the test.

The claimed state interest is to rid the political system of both apparent and actual corruption and improper influence. Under *Buckley* such a purpose justifies closely drawn restrictions. However, it does not appear that total prohibition of all contributions by any lobbyist is a closely drawn restriction.

First, the prohibition applies to contributions to any and all candidates even though the lobbyist may never have occasion to lobby the candidate. Secondly, the definition of lobbyist is extremely broad, to include persons who appear regularly before administrative agencies seeking to influence administrative determinations in favor of their clients. Thirdly, the statute does not discriminate between small and large but prohibits all contributions. Thus, it is not narrowly directed to the aspects of political association where potential corruption might be identified.

While either apparent or actual political corruption might warrant some restriction of lobbyist associational freedom, it does not warrant total prohibition of all contributions by all lobbyists to all candidates.

The governmental interests held to warrant substantial restrictions on political rights in *CSC* v. *Letter Carriers, supra,* 413 U.S. 548, have no greater application to lobbyists than to other private campaign contributors.

Section 86202 is invalid because it is not "closely drawn to avoid unnecessary abridgment of associational freedoms." (*Buckley* v. *Valeo, supra,* 424 U.S. 1, 25 [46 L.Ed.2d 659, 691].) This makes it unnecessary to discuss whether the section results in a denial of equal protection.

B. *Gifts and Other Lobbyist and Employer Regulations*

Lobbyists are prohibited from making gifts of more than $10 in any month to any state candidate, a legislative agency or elective state official or from participating in gifts by any other person. (§§ 86201, 86203.) Lobbyists are also required to register and to report all payments for lobbying activities, the names of those supplying the funds and the amounts they furnished, disbursements from the funds received, and any transactions with candidates or legislative agency, or state elective officials or their families. (§§ 86100-86107.) Lobbyists' reports must include any transaction totalling $500 or more in a single year with business entities in which the lobbyist knows or has reason to know that any state candidate, or legislative, agency, or elective official is a proprietor, partner, director, officer or manager or has more than a 50 percent interest. (See, § 86107, subd. (e).) Lobbyists must also report a "specific description of legislative or administrative action which the lobbyist has influenced or attempted to influence, and the agencies involved, if any." (§ 86107, subd. (f).)

Persons who employ a lobbyist or pay $250 in any month to influence legislative or administrative action must also file reports. Among other matters, the reports must disclose businesses engaged in, the total amount of payments to influence legislative or administrative action, any contributions made, the names of persons who received $25 or more, and a specific description of legislative or administrative action sought to be influenced. (§ 86109.) The transaction reporting requirement differs from that applicable to lobbyists, applying only to transactions totalling more than $1,000 per year. (*Id.,* subds. (d), (e).)

 Among the fundamental rights guaranteed by the First Amendment to the United States Constitution is the right to "petition the Government for a redress of grievances." The lobbyist's function obviously is to exercise such right on behalf of his employer. The challenged statutes do not directly limit or restrict the right to petition. Rather, the registration and reporting requirements impose burdens on the right to petition, and the gift limitation affects the form of the petition. All may petition provided they bear the burden of registration and reporting and do not offer excessive gifts.

Advocates claims that because speech and petition rights are affected, the strict scrutiny rule is applicable.

■ Although a fundamental interest may be involved, both the United States Supreme Court and this court have recognized that not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard. When the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied. (E.g., *Zablocki* v. *Redhail* (1978) 434 U.S. 374 [54 L.Ed.2d 618, 98 S.Ct. 673, 681-683] [regulations affecting the right to marry]; *Califano* v. *Jobst* (1977) 434 U.S. 47 [54 L.Ed.2d 228, 98 S.Ct. 95, 99] [same]; *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 303-305 [138 Cal.Rptr. 53, 562 P.2d 1302] [reasonable limitations on placement of newspaper racks]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337] [rational basis standard applicable to numerous statutes detailing the mechanisms of the right to vote].) It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied. (*Zablocki* v. *Redhail, supra,* 434 U.S. 374 [54 L.Ed.2d 618, 98 S.Ct. 673, 681]; *Gould* v. *Grubb, supra,* 14 Cal.3d 661, 670.)

In *United States* v. *Harriss* (1954) 347 U.S. 612, 625-626 [98 L.Ed. 989, 1000-1001, 74 S.Ct. 808], the court upheld the Federal Regulation of Lobbying Act which required lobbyists to report lobbying receipts and expenditures against challenges that it violated the guarantees of freedom to speak, publish, and petition. Pointing out that Congress had not sought to prohibit lobbying, the court concluded that Congress has a valid interest in determining the source of voices seeking to influence legislation and could reasonably require the professional lobbyist to identify himself and disclose his lobbying activities. This court has also upheld reasonable statutes requiring disclosure of financial activities of persons engaged in political processes. (*Brown* v. *Superior Court* (1971) 5 Cal.3d 509, 519-523 [96 Cal.Rptr. 584, 487 P.2d 1224]; cf. *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 670-672 [114 Cal.Rptr. 345, 522 P.2d 1354].)

■ As pointed out above, the registration, reporting, and gift provisions are not direct limitations on the right to petition for redress of grievances. Application of the burdens of registration and disclosure of receipts and expenditures to lobbyists does not substantially interfere with the ability of the lobbyist to raise his voice. While the burden of disclosure might be substantial for those engaging in extensive lobbying activities, the burden is not great when viewed in the context of the total activities engaged in. Requiring a person engaged in a business to describe it and to report its receipts and expenses may not be viewed in

our commercial society as a substantial impediment to engaging in that business.

Similarly, the burden placed on employers of lobbyists to disclose their expenditures for lobbying purposes, and the action thereby sought to be influenced, does not constitute a substantial interference with the exercise of petition and speech rights.

On the basis of *Harriss* and *Brown,* we sustain the validity of the provisions requiring the registration of lobbyists and their employers and the reporting of lobbying receipts, expenditures, and activities and employers' businesses.

The limitation on lobbyist gifts, affecting only the form of the petition, also does not have a real and appreciable impact on the legitimate exercise of the rights of petition and speech, and the strict scrutiny test is inapplicable.

 On the other hand, the transaction reporting requirements will often be so onerous as to constitute a significant interference with the fundamental right to petition. The extent of reporting required is not directly related to the extent of lobbying activities but is determined mainly by lobbyist and employer transactions with others, which may be entirely unrelated to lobbyist activities. For example, the reporting requirement as to business transactions applies to transactions with a business entity where any state candidate, or legislative, agency, or elective state official is a director. (§ 86109, subd. (e).) Accordingly, if a director of the Bank of America is also an agency official—perhaps a Regent of the University of California—a lobbyist and any person who employs a lobbyist or spends more than $250 in a single month to influence legislative or administrative action must disclose transactions above the statutory amount with the Bank of America. The requirement applies even though the lobbying activities have nothing to do with the university or banks. Because directors of many major corporations serve on boards and other administrative agencies, the transaction reporting requirement may be extremely burdensome, and persons and business, union or other organizations who only seek to influence governmental action on an isolated basis will be deterred from doing so by the burdensome reporting requirements.

Because the transaction reporting requirements will often constitute a significant interference with the fundamental right to petition, the strict

scrutiny doctrine is applicable. The requirements may be upheld only if the state demonstrates sufficiently important interests and the statute "is closely tailored to effectuate only those interests." (*Zablocki* v. *Redhail, supra,* 434 U.S. 374, 388 [54 L.Ed.2d 618, 631, 98 S.Ct. 673, 682]; *Buckley* v. *Valeo, supra,* 424 U.S. 1, 25.) Even if the compelling state interest is present, the restriction on First Amendment activities must be drawn with narrow specificity to avoid arbitrary and unnecessary curtailment of the protected freedom. (*Kash Enterprises, Inc.* v. *City of Los Angeles, supra,* 19 Cal.3d 294, 303; *Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 337-338 [38 Cal.Rptr. 625, 392 P.2d 385].)

We have considered the validity of disclosure requirements of financial activities of public officials and employees and held invalid a statute which "would intrude alike into the relevant and the irrelevant private financial affairs . . . and is not limited to only such holdings as might be affected by the duties or functions of a particular public office." (*City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 272 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *County of Nevada* v. *MacMillen, supra,* 11 Cal.3d 662, 671.) We are satisfied that the right to petition for redress of grievances similarly may not be conditioned upon disclosure of irrelevant private financial matters unrelated to the petition activity. Because the transaction reporting requirements apply to transactions having no relation to the lobbying activities, they are not "closely tailored" to any legitimate state interest in the regulation of lobbying but constitute an unnecessary curtailment of the right to petition.

## CONCLUSION

In sum, we conclude: The prohibition against lobbyist contributions set forth in section 86202 is a substantial limitation on associational freedoms guaranteed by the First Amendment, and is invalid. The right to petition for grievances guaranteed by the First Amendment may not be conditioned on disclosure of private financial matters irrelevant to the petition activity and section 86107, subdivisions (d) and (e) and section 86109, subdivisions (d) and (e) are therefore invalid. However, the other reporting requirements,· the registration requirements, and the limitation on gifts do not constitute substantial limitations on petition and speech rights, and the challenge to those provisions is rejected. Finally, the Political Reform Act of 1974 does not involve multiple subjects in violation of California Constitution, article II, section 8, subdivision (d).

Let a writ of mandate issue directing respondent court to vacate its judgment and to enter judgment in accordance with the views expressed herein.

Mosk, J., and Richardson, J., concurred.

**TOBRINER, J.,** Concurring.—In *Schmitz* v. *Younger* (1978) 21 Cal.3d 90 [145 Cal.Rptr. 517, 577 P.2d 652], I joined Justice Manuel's dissenting opinion, which concluded (1) that "the special nature of the initiative process requires a narrower construction" of the one subject requirement than the limitation on legislative bills, and (2) that "to satisfy the one-subject requirement, an initiative's provisions must be functionally related in furtherance of a common underlying purpose." (21 Cal.3d at pp. 99-100.) I continue to adhere to that position today. ▊ Unlike Justice Manuel, however, I believe that the 1974 Political Reform Act satisfies the standard enunciated in the *Schmitz* dissent. Accordingly, I agree with the majority that the lower court erred in invalidating the entire act. With respect to the remaining issues, I join in the majority's analysis and conclusions.

**NEWMAN, J.,** Concurring and ▊ I agree with the majority's conclusion that the single subject rule has not been violated. I do not agree, however, that enforcement of sections 86202, 86107, subdivisions (d) and (e), and 86109, subdivisions (d) and (e) of the Political Reform Act of 1974[1] should be enjoined.

In my view the majority opinion does not adequately advise California legislators and citizens generally as to their powers to regulate lobbying.

Language reading substantially as follows has been part of the California Constitution for 100 years: "A person who seeks to influence the vote or action of a member of the Legislature in the member's legislative capacity by bribery, promise of reward, intimidation, or other dishonest means, or a member of the Legislature so influenced, is guilty of a felony." (Art. IV, § 15.) In 1972 the electors commanded additionally that "[t]he Legislature shall . . . provide for . . . free elections" and "shall prohibit improper practices that affect elections . . . ." (Art. II, § 3 and § 4.) Two years later, apparently because they believed that regulations

---

[1]Government Code section 81000 et seq.

complementing the constitutional language were essential, the electors via the initiative approved the Political Reform Act of 1974.

The majority opinion states, "The claimed state interest is to rid the political system of both apparent and actual corruption and improper influence." (*Ante,* p. 45.) That is an unconscionably bowdlerized paraphrase of complex aims that in the initiative measure were declared to be as follows (and note especially the declaration that "[p]revious laws regulating political practices have suffered from inadequate enforcement by state and local authorities"[2]):

"The people find and declare as follows:

"(a) State and local government should serve the needs and respond to the wishes of all citizens equally, without regard to their wealth;

"(b) Public officials, whether elected or appointed, should perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them;

"(c) Costs of conducting election campaigns have increased greatly in recent years, and candidates have been forced to finance their campaigns by seeking large contributions from lobbyists and organizations who thereby gain disproportionate influence over governmental decisions;

"(d) The influence of large campaign contributors is increased because existing laws for disclosure of campaign receipts and expenditures have proved to be inadequate;

"(e) Lobbyists often make their contributions to incumbents who cannot be effectively challenged because of election laws and abusive practices which give the incumbent an unfair advantage;

"(f) The wealthy individuals and organizations which make large campaign contributions frequently extend their influence by employing lobbyists and spending large amounts to influence legislative and administrative actions;

---

[2]Compare Newman, Legal Aspects of Representation, California Laws on Lobbying, Legislators' Orientation Conference (1959) pages 125-130.

"(g) The influence of large campaign contributors in ballot measure elections is increased because the ballot pamphlet mailed to the voters by the state is difficult to read and almost impossible for a layman to understand; and

"(h) Previous laws regulating political practices have suffered from inadequate enforcement by state and local authorities." (Gov. Code, § 81001.)

"The people enact this title to accomplish the following purposes:

"(a) Receipts and expenditures in election campaigns should be fully and truthfully disclosed in order that the voters may be fully informed and improper practices may be inhibited;

"(b) The amounts that may be expended in statewide elections should be limited in order that the importance of money in such elections may be reduced;

"(c) The activities of lobbyists should be regulated and their finances disclosed in order that improper influences will not be directed at public officials;

"(d) Assets and income of public officials which may be materially affected by their official actions should be disclosed and in appropriate circumstances the officials should be disqualified from acting in order that conflicts of interest may be avoided;

"(e) The state ballot pamphlet should be converted into a useful document so that voters will not be entirely dependent on paid advertising for information regarding state measure;

"(f) Laws and practices unfairly favoring incumbents should be abolished in order that elections may be conducted more fairly; and

"(g) Adequate enforcement mechanisms should be provided to public officials and private citizens in order that this title will be vigorously enforced." (Gov. Code, § 81002.)

"This title should be liberally construed to accomplish its purposes." (Gov. Code, § 81003.)

Who are lobbyists? The majority opinion correctly quotes section 82039 as follows: " 'Lobbyist' means any person who is employed or contracts for economic consideration, other than reimbursement for reasonable travel expenses, to communicate directly or through his agents with any elective state official, agency official or legislative official for the purpose of influencing legislative or administrative action, if a substantial or regular portion of the activities for which he receives consideration is for the purpose of influencing legislative or administrative action. No person is a lobbyist by reason of activities described in Section 86300." Not mentioned, however, is section 82002, which tells us that " '[a]dministrative action' means the proposal, drafting, development, consideration, amendment, enactment or defeat by any state agency of any rule, regulation or other action in any rate-making proceeding or any quasi-legislative proceeding, which shall include any proceeding governed by Chapter 4.5 of Division 3 of Title 2 of the Government Code (beginning with Section 11371)." That definition, I think, disposes of the majority's comment that "the definition of lobbyist is extremely broad, to include persons who appear regularly before administrative agencies seeking to influence administrative determinations in favor of their clients." (Majority opn., *ante*, p. 45.) In other words, and presumably because rule making is comparable to statute making,[3] the electors approved the regulation of administrative as well as legislative lobbying. I do not regard that as unreasonable, and I do not agree that "[t]he governmental interests held to warrant substantial restrictions on political rights . . . have no greater application to lobbyists than to other private campaign contributors." (*Id.,* p. 45.)

Nor do I accept the majority's suggestion that prohibition of contributions is suspect when "the lobbyist may never have occasion to lobby the candidate." (*Id.,* p. 45.) What if the candidate is a relative, a friend, or a potential colleague, political or professional, of persons whom the lobbyist does intend to lobby? The search for "disproportionate influence over governmental decisions" (Gov. Code, § 81001, subd. (c)) can cause campaign funds to flow in channels that become labyrinthine, producing effects that sometimes seem almost subliminal.

How, I wonder, do the following words from the majority opinion enlighten legislators and citizens? "[T]he statute [Gov. Code, § 86202] does not discriminate between small and large but prohibits all contribution. Thus, it is not narrowly directed to the aspects of political

---

[3]"Rulemaking is the administrative counterpart of what a legislative body does when it enacts a statute." (Davis, Administrative Law and Government (2d ed. 1975) p. 118.)

■

association where potential corruption might be identified." (Majority opn., *ante,* p. 45.) As I indicated above, to imply that "corruption" was the sole evil the electors sought to eradicate seems simplistic, almost quaint.

The Political Reform Act of 1974 is not a prototype of sapient drafting. Section 81012 does, however, anticipate possible needs for amendment. Given the complex findings, declarations, and statements of purpose that the electors chose to set forth in sections 81001 and 81002, *supra,* I contend that courts are best advised to await further legislative consideration. They should not comb the law now for clauses that, under varying opinions of the United States Supreme Court (particularly as to "strict scrutiny"), in a more routinely motivated law might be categorized as insufficiently "tailored." The majority opinion, for instance, so labels clauses that arguably involve "irrelevant private financial matters unrelated to the petition activity." (*Ante,* p. 49.) To achieve the declared and legitimate aims of the law before us in this case, I submit that defining the appropriate borderlines of that kind of relevance is a task best assigned to legislators and administrators, not judges.

**MANUEL, J.**—I dissent. In my view the trial court correctly held that the 1974 Political Reform Act is invalid and void in its entirety because it "embrac[es] more than one subject" in violation of the provisions of article II, section 8, subdivision (d) of the state Constitution, the so-called single subject rule. Accordingly, I would deny the writ.

It has now been more than 30 years since this court, in the case of *McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787], carefully laid to rest the notion that the initiative power of the people, by virtue of its unique and precious nature as well as its constitutional source, is to be considered free of all constitutional constraints on its exercise. In my view the majority, by applying the single subject rule in a manner which is tantamount to its nullification, has today taken a significant step toward the resurrection of that notion.

In the *McFadden* case, which must form the basis of any proper understanding of the initiative single subject rule, we were faced with an initiative proposal consisting of 12 separate sections and 208 subsections which, in the compass of more than 21,000 words, treated a wide variety of subjects ranging from reapportionment to oleomargarine. Although we

noted the dangers inherent in such a manner of presentation,[1] the Constitution at that time contained no provision precluding it, and we were therefore unable to ground our decision directly on this point. Because, however, of the comprehensive scope and effect of the proposal viewed as a whole, we concluded that it amounted to a *revision* of the Constitution, which by express provision could be accomplished only through the convening of a constitutional convention prior to submission to the people for ratification.

The initiative single subject rule, now contained in article II, section 8, subdivision (d) of the Constitution, is a direct outgrowth of the *McFadden* decision. The 1948 Legislature, obviously perceiving that some future "multifarious" initiative might not be so comprehensive as to amount to a constitutional revision, and obviously being mindful of the dangers to which we had adverted, caused to be placed on the November 1948 general election ballot what subsequently became, following approval by the voters by a margin of more than two to one, former article IV, section 1c of the Constitution, which was reenacted by the voters in its present form as a part of the 1966 constitutional revision.

For reasons which I have set out at length in my dissenting opinion in *Schmitz v. Younger* (1978) 21 Cal.3d 90, at pages 96-101 [145 Cal.Rptr. 517, 577 P.2d 652], I am of the view that the mandate of article II, section 8, subdivision (d) is satisfied only when the provisions of an initiative measure can be said to be "functionally related in furtherance of a common underlying purpose." (21 Cal.3d at p. 97.) This standard, which has recently been applied by this court in *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 230 [149 Cal.Rptr. 239, 583 P.2d 1281], accurately reflects the meaning of the initiative single subject rule in light of its history, and for this reason it is to be preferred in the initiative context to the broader, more vague "reasonably germane" test which is applicable in the context of legislative statutes.[2] As I proceed to explain, however, I am persuaded that the measure now before us fails either test.

---

[1]"The proposal," we said "is offered as a *single amendment* but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all." (32 Cal.2d at p. 346.)

[2]It is notable in this respect that the legislative single subject rule, unlike that applicable in the case of initiatives, contemplates only a *partial* nullification in the event of violation.

Turning to the measure itself we find at the outset that it is of prodigious physical proportions. Containing 11 separate chapters and 215 sections, its text covered over 16 closely packed pages of the voter's pamphlet for the June 1974 Primary Election, and its printing in one edition of the annotated codes requires no less than 131 pages. (37B West's Ann. Gov. Code (1976 ed.) §§ 81000-91014, pp. 3-134.) As enacted, it was comprised of more than 20,000 words—or approximately 1,000 less than the measure which we confronted in the *McFadden* case. Although there is no specific constitutional limit on the size of an initiative measure,[3] it might be expected that one requiring this amount of legal technical verbiage would undertake to address itself to more than one "subject." Such expectations, as I point out below, are in this case not held in vain.

It is interesting to note that the parties supporting the instant measure seem to have some difficulty agreeing upon the identity of the "single subject" which it is asserted to comprehend. Thus petitioner Fair Political Practices Commission claims that the initiative "concern[s] . . . the reform and integrity of the political process." Amici curiae Common Cause, League of Women Voters and Sierra Club, on the other hand, appear to change the focus somewhat, asserting at oral argument that the "single subject" is that of "making government more accountable by diminishing the influence of wealth on governmental processes." A brief filed by other amici curiae in support of the measure identifies the prevention of "deceptive practices" as its subject matter, while the Attorney General, who has filed a return in support of the petition for mandate, prefers to speak simply in terms of "political reform." It is not surprising, in my view, that such a lack of unanimity should appear, for all of the aforesaid formulations speak not to the matter of the measure's

---

Article IV, section 9 provides: "A *statute* shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not in its title, *only the part not expressed is void.*" (Italics added.) Article II, section 8, subdivision (d), on the other hand, provides: "An *initiative* measure embracing more than one subject may not be submitted to the electors *or have any effect.*" (Italics added.) The concern in the legislative context is thus whether a proposed statute contains material extraneous or not "reasonably germane" to the subject stated in the title; if it does, the extraneous material is simply stricken. In the initiative context, on the other hand, the issue is more sharply defined: a measure whose parts are not functionally related to a common subject or purpose is to be accorded no effect. In the one case, then, we seek only to exclude the extraneous; in the other, it is the validity of the whole which is at stake.

[3]It is noteworthy that one commentator, addressing himself to the physical proportions of the measure here in question, was led to conclude: "Even though the Political Reform Act [of 1974] was successful, it is highly unlikely that the voters understood even a substantial portion of the Act." (Note, *The California Initiative Process: A Suggestion for Reform* (1975) 48 So.Cal.L.Rev. 922, 935, fn. 65.)

*subject* but rather to the general *policy objectives* it seeks to achieve as a result of the comprehensive legislative program it represents. In short, the parties' difficulty in expressing the "single subject" of the Political Reform Act of 1974 results from the simple fact that there *is* no single subject; rather the measure speaks to a multitude of subjects which, by means of a broad statement of policy objective, the parties seek to place under a single umbrella.[4] The single subject rule, however, is not concerned with umbrellas; it is concerned with *subjects*.

No purpose would here be served by undertaking a listing of what I conceive to be the various subjects comprehended in the measure before us. It suffices, I think, to point out the obvious: The regulation of the election process, no matter how broadly defined, has little to do with the regulation of the day-to-day activities of lobbyists. The adoption of codes governing conflicts of interest in all state agencies—the provisions of such codes to affect any employee occupying a position which "involve[s] the making or participation in the making of decisions which may foreseeably have a material effect on any financial interest" (§ 87302, subd. (a))—is yet another matter. Although each of these might conceivably form a part of a unified legislative program directed toward the policy objective of "political reform," each concerns an entirely different and discrete *subject*.

I do not of course suggest that the single subject requirement of our Constitution precludes the presentation to the electorate, on a single ballot, of a number of related subjects in furtherance of some underlying policy objective. What I do suggest is that when this is done, our Constitution requires that each subject be separately set out by means of an independent proposition, so that voters favoring one aspect of the program but opposed to another may have the opportunity to accurately reflect these views in their votes. Any other result, I submit, has the effect

---

[4]To be distinguished from the instant situation, I believe, is that which was recently before us in the so-called "Proposition 13 cases" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208). Although the measure there in question had four major elements—a real property tax rate limitation, a real property assessment limitation, a restriction on state taxes, and a restriction on local taxes—we pointed out that each was part of "an interlocking 'package' deemed necessary by the initiative's framers to assure *effective* real property tax relief," i.e., real property tax savings which could not be "withdrawn or depleted by additional or increased local levies of other than property taxes. . . ." (22 Cal.3d at p. 231). In this respect we contrasted the case of *Kerby* v. *Luhrs* (1934) 44 Ariz. 208 [36 P.2d 549], a measure dealing with diverse matters relating to "taxation." (*Id.,* at pp. 231-232.) In my view the measure here before us, similarly dealing in diverse ways with various practices under the broad banner of "political reform," should share the fate of the Arizona "taxation" initiative.

of transforming what has been termed the "legislative battering ram" of the initiative (see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 228, 229, 232) into a legislative blunderbuss.

I would deny the writ.

**BIRD, C. J.,** Dissenting.—I cannot agree with the pinched view of the First Amendment which the majority adopt in declaring unconstitutional Government Code section 86202 and subdivisions (d) and (e) of Government Code sections 86107 and 86109. In one fell swoop, this court has gutted the Political Reform Act of 1974, which ended the undue influence of lobbyists and moneyed interests over our state government. Today's decision moves California farther from, not closer to, a First Amendment society where individuals are able to speak meaningfully with their public representatives and be heard. Once again, "money will be the mother's milk of politics" with the third house owning the dairy.

In *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612], the United States Supreme Court recognized that the realities of modern campaigning drives candidates to depend more and more on large campaign contributors. The court recognized that this dependence meant that democracy would not be served if wealthy benefactors controlled elected officials. The *Buckley* court was concerned that there inevitably lingered "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." (*Id.,* at p. 27 [46 L.Ed.2d at p. 692].) Antithetical to the very idea of *representative* democracy, the Supreme Court noted, is "the actuality and appearance of corruption resulting from large individual financial contributions." The court concluded that this concern was "a constitutionally sufficient justification" for placing a limit of $1,000 on campaign contributions. (*Id.,* at p. 26.)

The California Political Reform Act aims at freeing government and its officials from the actuality or appearance of corruption. Instead of imposing contribution limits on everyone as in the *Buckley* case, the California law zeros in on the age-old problem of lobbyist money. The abuse inherent in having persons, who are paid to influence state policy, pass money to the formulators of state policy is all too apparent.

The majority find section 86202 overbroad because it (1) prohibits "small" as well as "large" contributions; (2) prohibits contributions to

state candidates other than those whom the lobbyist is trying to influence; and (3) includes lobbying before state administrative agencies as well as elected officials in state government. The majority choose to ignore the fact that there is a heightened threat to the image and integrity of state government which results when a lobbyist can use money to purchase influence.

The majority's distinction between "large" and "small" campaign contributions misreads *Buckley*. The federal election laws themselves contain a *total* ban on large or small campaign contributions from corporations, unions, and national banks to any candidate for federal office. (2 U.S.C. § 441b.) These prohibitions have been held to be constitutional. (See, e.g., *United States* v. *Chestnut* (S.D.N.Y. 1975) 394 F.Supp. 581, 587-591; *United States* v. *Boyle* (D.C.Cir. 1973) 482 F.2d 755, 763-764 [24 A.L.R.Fed. 144].) Even the United States Supreme Court "has repeatedly recognized that one of the principal purposes of [the] prohibition is 'to avoid the deleterious influences on . . . elections resulting from the use of money by those who exercise control over large aggregations of capital.' *United States* v. *Automobile Workers,* 352 U.S. 567, 585 (1957). See *Pipefitters* v. *United States,* 407 U.S. 385, 415-416 (1972); *United States* v. *CIO,* 335 U.S., at 113." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 812 [55 L.Ed.2d 707, 740, 98 S.Ct. 1407] (dis. opn. of White, J.).)

It has never been held to be too drastic to ban corporate and union campaign contributions. Rather, the courts have emphasized that the statutes allow corporations and unions to establish segregated political funds to which they may solicit voluntary contributions and from which they may make campaign contributions. (See *United States* v. *Chestnut, supra,* 394 F.Supp. at p. 591.) The narrow reach of California's ban on lobbyist contributions is similar. The employers of lobbyists are free to contribute as they please to political candidates. Lobbyists may recommend to their employers to whom they should contribute and in what amounts. (*Institute of Governmental Advocates* v. *Younger* (1977) 70 Cal.App.3d 878, 884 [139 Cal.Rptr. 233].) Further, lobbyists are free to express their own personal preferences in politics, except they cannot make campaign contributions or certain size gifts to candidates for state office.

Section 86202 attempts to prevent the actuality or appearance of public officials as the captive of special interest groups by removing from lobbyists the ability to buy the ear of state officials with money. The

people have every right to prevent the venal spectacle of lobbyists passing money to candidates or officials whose acts they want to influence. This compelling state interest was accomplished by placing restrictions on lobbyist contributions and gifts to officeholders.[1]

The narrow restrictions of the Political Reform Act pale beside the restrictions of the Hatch Act on federal employees. Those who come within the confines of the Hatch Act are prohibited from taking "an active part in political management or in political campaigns." This results in a ban on just about all partisan political activity by federal employees. Despite this fact, the United States Supreme Court has found the Hatch Act constitutional on two occasions. (*CSC* v. *Letter Carriers* (1973) 413 U.S. 548 [37 L.Ed.2d 796, 93 S.Ct. 2880]; *United Public Workers* v. *Mitchell* (1947) 330 U.S. 75 [91 L.Ed. 754, 67 S.Ct. 556].) The prohibition on partisan political activity by federal employees was held to be justified by the government's compelling interest in preserving the civil service from the corruption that might result if one's job came to depend on one's politics. (*CSC* v. *Letter Carriers, supra,* 413 U.S. at pp. 564-567 [37 L.Ed.2d at pp. 808-810].)

In *Letter Carriers,* the United States Supreme Court acknowledged that the federal government's interest in preserving its own integrity was sufficient to justify restrictions on the First Amendment rights of federal employees. Similarly, the state government's interest in preserving its own integrity is equally compelling. If the Hatch Act prohibitions survived strict scrutiny, the less restrictive Political Reform Act prohibitions on lobbyists certainly should.

The majority misuse the *Buckley* case and refer out of context to the special problems involved with "large" political contributions. The court was reviewing a statute which restricted the amount of money *anyone* could contribute in a federal election. Consequently, the Supreme Court focused on the corruption inherent in the dependence of candidates on large contributions. *Buckley* does not indicate that dependence on large contributions is the only fertile source of corruption. The majority err when they apply the language of *Buckley* to a new fact situation without considering the nature of lobbying.

---

[1]If section 86202 had been written so as to allow a lobbyist to express his personal views about a candidate by contributing his own personal money as opposed to his employer's, that exception would have rendered the law a nullity from the beginning. Special interest groups employing lobbyists could have simply increased their lobbyists' salaries, on the tacit understanding that the lobbyist would use that extra money to make campaign contributions.

Lobbyists are employed by special interest groups to achieve a particular result. They are successful only to the extent they are able to influence the vote or policy of legislators or public officials. Lobbyists are paid to advocate their employers' viewpoint. The employers are usually "big money" interests. Daily contact with those they seek to influence is essential.

Lobbyists set about their task of influencing government officials by establishing personal contact. Obviously, the ability to give gifts, buy lunches, contribute to campaigns helps a lobbyist ensure that his invitations to talk over matters with public officials are accepted. *Access* is the key to influence. Having opened the door, the campaign contribution whether large or small is in a position to speak not only for itself but to deliver a message amplified by the resources of the special interest groups employing the lobbyist. Special interest groups employ lobbyists because such groups believe the greater the access they have to state officials, the greater the possibility that these officials will reflect their viewpoint. The giving of a campaign contribution, regardless of size, is sufficient to establish the necessary access.

The unfettered access of a lobbyist to state officials can defeat the basic idea of a society that is based on elective officials who represent *all* the people. The parties to this litigation stipulated that prior to the passage of the Political Reform Act, lobbyists regularly purchased meals and drinks for state officials; provided hunting, fishing and vacation trips for officials and their families; purchased liquor, art work and golf clubs; held weekly gatherings at which meals, drinks and entertainment were provided; and had complete control over the campaign funds of their employers, which included the power to determine who and how much an official would receive in political contributions. "[S]ome lobbyists engaged in the practices enumerated [above] for the purpose of gaining undue influence over legislators and state officials."

The United States Supreme Court many years ago upheld the Federal Regulation of Lobbying Act and recognized that "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal." (*United States* v. *Harriss* (1954) 347 U.S. 612, 625 [98 L.Ed. 989, 74 S.Ct. 808].) In 1974, the voters of this state decided to insulate state officials from lobbyists and their undue influence by removing from them the ability to "buy" access and good will by dispensing gifts and contributions.

The First Amendment has never precluded our citizens from taking action to restore integrity to state government by achieving a certain balance between the access of the individual citizen and the access of the lobbyist to public representatives.

The majority opinion invalidates section 86202 based on the fact that the "prohibition applies to contributions to any and all candidates even though the lobbyist may never have occasion to lobby the candidate." (Maj. opn., *ante,* at p. 45.) How can this fact justify invalidating section 86202? "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." (*Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 613 [37 L.Ed.2d 830, 841, 93 S.Ct. 2908].) If the majority consider the statute overbroad, they could have narrowly construed section 86202 so as to preclude lobbyists from contributing to candidates whom they lobby. Instead, the majority strike down section 86202, thereby allowing lobbyists to contribute to the campaigns of candidates they do in fact lobby. In other words, the majority opinion today achieves a result it does not seek to defend.

Further, the majority make a distinction between lobbyists who contribute to officials who do and those who do not have jurisdiction over the kind of decisions the lobbyist is seeking to influence. This distinction overlooks a practical reality. "[M]embers of the Legislature and the constitutional officers . . . play a role in (1) defining [an] agency's powers; (2) adopting legislation bearing on the work of [an] agency; (3) determining the budget of [an] agency; (4) making or confirming appointments to [an] agency; and (5) considering future appointments to other governmental posts for the incumbent agency officials. In addition to these factors is the prestige of these elected officials which may give their communications with and urgings upon administrative agency officials special weight. Because of this extensive influence, the purposes of the Political Reform Act necessitate that the . . . prohibitions on . . . contributions be applicable to all elected state officers and candidates for such offices and to all legislative officials, even in the case of a lobbyist who confines his activities to one or more administrative agencies." (Cal. Admin. Code, tit. 2, § 18600.) This opinion by the Fair Political Practices Commission points up the fatal weakness in the majority's overbreadth analysis. Unless lobbyists are prevented from contributing to all elective state officers or to the candidates for state office, the Political Reform Act could never achieve its aim of curbing the abuses that led to its passage in the first place.

Next, the majority find that "the definition of lobbyist [in section 86202] is extremely broad, [and] include[s] persons who appear regularly before administrative agencies . . . ." (Maj. opn., *ante,* at p. 45.) This criticism lacks merit. Administrative agencies often deal with the most important decisions our government makes. Therefore, it would have been sheer folly for a law purporting to regulate lobbying to have excluded from its scope the appearance of lobbyists before administrative agencies which are involved in rule-making, rate-making or quasi-legislative proceedings. (Gov. Code, § 82002.) The Fair Political Practices Commission's own interpretation of the scope of the Political Reform Act limits its reach as it relates to administrative lobbying. "The purpose of the prohibitions and disclosure requirements [of the Political Reform Act] as applied to agency officials is to assure that no undue economic influences will be brought to bear on such officials when they undertake administrative actions. This purpose would not be furthered if the prohibitions and disclosure requirements were interpreted as being applicable to all agency officials, without regard to whether the lobbyist or the filer had attempted to influence administrative actions of the official's agency." Therefore, the commission has limited the lobbying disclosure requirements and prohibitions of the act "to officials of agencies the administrative actions of which the lobbyist or filer has attempted to influence." (Cal. Admin. Code, tit. 2, § 18600.)

Even more perplexing is the majority's decision to invalidate subdivisions (d) and (e) of Government Code sections 86107 and 86109. Section 86107, subdivision (d) requires lobbyists to file a report listing all economic transactions with any elective state official, legislative official, agency official, state candidate, or with a member of the immediate family of any such official or candidate. Section 86107, subdivision (e) requires lobbyists to report transactions with any business entity in which "the lobbyist knows or has reason to know that [a state official or state candidate] is a proprietor, partner, director, officer or manager, or has more than a fifty percent ownership interest," if the transactions total $500 or more in a calendar year. Section 86109, subdivisions (d) and (e) impose similar disclosure requirements on employers of lobbyists or any person who pays $250 or more in any month to influence legislative or administrative action.

These reporting requirements are held to be unduly onerous by the majority because transactions must be disclosed "which may be entirely unrelated to lobbyist activities." (Maj. opn., *ante,* at p. 48.) The majority fail to realize that if it were not for these provisions, lobbyists and their

employers could entirely avoid the disclosure requirements of the act by giving money and other items of value through their families or businesses to state officials or candidates. The drafters of the Political Reform Act should not be criticized because they foresaw and, therefore, plugged the expected loopholes.[2]

In *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662 [114 Cal.Rptr. 345, 522 P.2d 1345], this court upheld the Governmental Conflict of Interests and Disclosure Act (Gov. Code, § 3600 et seq.) against similar charges of prying into personal finances. A candidate had to disclose the nature of the economic holdings of his spouse and dependent children. This was held to be reasonable because this provision prevented a candidate from avoiding disclosure of his finances entirely by transferring title to his spouse or children. (*Id.,* at pp. 675-676.) In striking down the disclosure requirements of the Political Reform Act that lobbyists disclose transactions with the immediate families of state candidates or officeholders, the majority ignore the authority of *County of Nevada* v. *MacMillen, supra.*

The Political Reform Act of 1974 brought to state government a measure of integrity not previously present. The First Amendment was served by the assurance that access to elected officials did not belong only to those with money. The majority opinion does not advance the First Amendment today. Rather, it takes us a giant step backward to the times when special interests represented by lobbyists were the loudest and most powerful voices in our legislative halls.

Petitioner's application for a rehearing was denied October 11, 1979. Bird, C. J., and Newman, J., were of the opinion that the application should be granted.

---

[2]The flaws in the majority's argument are obvious when their own example is considered. (*Ante,* at p. 48.) If a state official is a director or a majority shareholder of the Bank of America, then the fact that a person lobbying that official is also engaging in business transactions of $500 or more with the Bank of America is highly relevant information to assess the economic pressure a lobbyist may bring on the state official. The official's position with the Bank of America has a material or substantial economic impact on that person. The $500 threshold is protection against onerous or trivial reporting requirements.

Further, the Fair Political Practices Commission has adopted a regulation which requires an agency lobbyist to disclose his various dealings and transactions with an agency official only if he is engaged in lobbying before that official's agency. (Cal. Admin. Code, tit. 2, § 18600.)