[No. C003936. Third Dist. Apr. 15, 1988.]

CALIFORNIA TRIAL LAWYERS ASSOCIATION, INC., et al., Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
ASSOCIATION OF CALIFORNIA INSURANCE COMPANIES et al., Real Parties in Interest.

352

COUNSEL

Joseph Remcho, Kathleen J. Purcell, Lowell Finley and Remcho, Johansen & Purcell for Petitioners.

Ray Ulrick as Amicus Curiae an behalf of Petitioners.

No appearance for Respondents.

John E. Mueller, John H. Hodgson II, Nielsen, Merksamer, Hodgson, Parrinello & Mueller, Allen Katz and Munger, Tolles & Olsen for Real Parties in Interest.

Otto M. Kaus, Peter O. Israel and Hufstedler, Miller, Carlson & Beardsley as Amici Curiae on behalf of Real Parties in Interest.

OPINION

PUGLIA, P. J.—The California Trial Lawyers Association and Leonard Esquina (petitioners) seek a writ of mandate commanding the Secretary of State and the registrars of voters for Sacramento, San Francisco and Los Angeles Counties (respondents) to refrain from undertaking or continuing any action to qualify or place on the ballot a proposed initiative. The initiative is entitled the "Insurance Cost Control Initiative of 1988" ("the initiative"). Real parties in interest are Stanley Zax and the Association of California Insurance Companies (hereafter referred to collectively as "Association"). The Association of California Insurance Companies participated along with other insurance industry representatives in the development of the initiative.[1]

On January 26, 1988, the Attorney General provided the Secretary of State with a title and summary of the initiative prepared pursuant to Elections Code sections 3503 and 3513. Thereafter supporters of the initiative began circulating petitions to have it placed on the November 1988 general election ballot.

 Petitioners assert the initiative is invalid in its entirety because it violates article II, section 8, subdivision (d) of the California Constitution, which provides that "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." We agree with

---

[1] The Association of California Insurance Companies objects to petitioners' description of it as a "proponent" of the initiative. However, it does not contest its designation as an interested party in these proceedings.

petitioners and shall order a writ to issue prohibiting respondents from qualifying, certifying or placing the initiative on the ballot.

The initiative is lengthy, covering 120 typewritten pages and consisting of 67 sections. The initiative would adopt, repeal, amend or reenact numerous sections of the Insurance Code and make somewhat fewer changes to the Vehicle Code. Its general impact is outlined in the Attorney General's summary, which reads in part: "MOTOR VEHICLE AND OTHER INSURANCE. INITIATIVE STATUTE. Establishes no fault insurance for automobile accident injuries, covering medical expenses, lost wages, and funeral expenses. Accident victim may recover from responsible party only for injuries beyond no fault limits, and not for noneconomic injuries except in cases of serious and permanent injuries and specified crimes. Reduces average premiums for certain coverages 20% for two years. Limits future insurance regulation legislation. Requires arbitration of disputes over insurers' claims practices, limits damage awards against insurers. Prohibits agents and brokers from discounting. Increases Insurance Commissioner's power to prosecute fraudulent claims. Limits attorney contingency fees. Contains other provisions. . . ."

Introductory passages of the initiative include statements describing the perceived evils at which it is aimed, the means by which it would remedy those evils, and its ultimate purpose: "*Section 2. Findings and Declaration.* [¶] The people find and declare as follows: [¶] 1. Insurance costs, the number of claims and lawsuits, and the size of jury awards have increased greatly in California in recent years. A large percentage of court awards goes to pay legal fees and court costs. These costs are ultimately passed on to the public in the form of higher insurance premiums. [¶] 2. A system of no fault automobile insurance will reduce wasteful litigation, speed payment of claims, and help stabilize insurance costs. A no fault system which mandates a two year statewide average reduction in the rates for basic automobile insurance for personal injuries (including no fault insurance, liability insurance, medical payments and uninsured motorist insurance) will result in automobile insurance premium savings. [¶] 3. A no fault automobile insurance system should (a) provide that specified compensation for bodily injuries be paid directly by the insured's insurance company regardless of fault, (b) allow compensation for property damage and additional compensation for serious and permanent injuries to continue to be based on the present fault system, (c) place limits on attorneys' contingency fees, and (d) provide that no insurance company can cancel, refuse to renew, or increase the rate charged any person for any insurance policy solely on account of any prior payment of a no fault claim, where that person is deemed not at fault. [¶] 4. Penalties should be increased for uninsured motorists. [¶] 5. Insurance rates should be established by

competition in the open market. [¶] 6. Fraudulent insurance claims have resulted in greater insurance costs requiring stronger anti-fraud laws. [¶] 7. The Insurance Commissioner should impose penalties and fines on insurance companies which unlawfully discriminate in setting rates, and should hear evidence from consumers in proceedings before the Commissioner. [¶] 8. Arbitration procedures should be established to allow disputes regarding claims under liability insurance policies to be resolved without costly litigation. [¶] *Section 3. Purpose.* [¶] The people enact this initiative to control the cost of insurance in California by establishing a no fault system to govern motor vehicle accident claims, by increasing penalties for uninsured motorists, by requiring that insurance rates be established by market competition, by providing an option for speedy resolution by arbitration of disputes with insurers over liability claims and by regulating insurance fraud and anti-competitive insurance company practices."

It is no exaggeration to characterize the changes in current insurance law which the initiative would effect as revolutionary. As one would expect, such a drastic revision finds expression in a large number of varied, detailed and complex statutory provisions. One of those, located inconspicuously at pages 52 and 53 of the typewritten measure, is section 8 which would add to the Insurance Code a new section 12901.5 entitled, "Regulation of campaign contributions" as follows: "(a) Any consumer protection organization, insurer, licensee, or trade association shall have no greater or lesser right to make any campaign contributions to any public official than is enjoyed by any other citizen of this state. [¶] (b) Any elected state official who receives any lawful campaign contribution from or the benefit of any expenditure made by any consumer protection organization, insurer, licensee, or trade association shall not be disqualified thereby from participating in any decision affecting any interest of the donor."

Petitioners argue that section 8 so diverges in purpose and effect from the rest of the initiative that it violates the constitutional prohibition on initiatives which encompass more than one subject. Association denies that there is a violation of the "single-subject rule"; alternatively it asserts that if there is, section 8 may be severed and the remainder of the initiative saved. ■ As a threshhold defense Association urges us to defer consideration of the merits until after the November 1988 election. We address this latter argument first.

I

■ In asking us to deny the petition on the ground that it would be premature to act at this stage, Association relies primarily on *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1 [181 Cal.Rptr. 100, 641 P.2d 200], at page 4 where

the court states: "As we have frequently observed, it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. (E.g., *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 535 [50 Cal.Rptr. 881, 413 P.2d 825]; *Wind* v. *Hite* (1962) 58 Cal.2d 415, 417 [24 Cal.Rptr. 683, 374 P.2d 643]; *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 256-257 [101 Cal.Rptr. 628].)"

 In *Brosnahan* v. *Eu, supra,* the court was faced with a preelection, single-subject challenge to the 1982 "Victim's Bill of Rights" initiative. (31 Cal.3d, at pp. 2-3.) By the time the court rendered its decision, the proponents had gathered over 600,000 signatures on petitions, the Secretary of State had undertaken the process of signature verification, and a superior court had ordered the measure certified and placed on the June ballot. (*Ibid.*) In contrast, at the time the instant petition was filed matters had not advanced beyond the stage of collecting signatures. More significantly, in *Brosnahan,* the Supreme Court pronounced no absolute prohibition on preelection judicial review. Rather, it expressly left open the possibility for such intervention where the alleged constitutional infirmity is "clear." Indeed, as Justice Broussard noted in his concurring opinion, article II, section 8, states in no uncertain terms that an initiative which does not comply with the single subject limitation " '*may not be submitted to the electors . . . .*' " (31 Cal.3d at p. 4; original italics.) Thus, the Constitution itself plainly contemplates that "under normal circumstances" a determination as to whether a proposed initiative encompasses more than one subject should be made before the measure is voted upon.[2]

 Accordingly, since we believe the initiative presents a palpable transgression of the single-subject rule, and perceive no overriding circumstances which militate against preelection resolution of that issue, we shall reach the merits of the petition.

## II

The historical background and purpose of article II, section 8, subdivision (d), have been exhaustively recounted in several recent Supreme Court decisions, and it would be redundant for us to engage in yet another such exposition. (See *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1097-1101

---

[2] We are cognizant of the fact, reiterated emphatically by Association, that no court of this state has undertaken such prior review. However, this is no more than a historical fact which itself provides no reason to refrain from doing so when, as here, fidelity to the plain language of the Constitution requires it.

[240 Cal.Rptr. 569, 742 P.2d 1290]; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 245-253 [186 Cal.Rptr. 30, 651 P.2d 274]; *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 37-43 [157 Cal.Rptr. 855, 599 P.2d 46] (hereafter *FPPC*); *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 229-232 [149 Cal.Rptr. 239, 583 P.2d 1281].) ▉ These decisions inform us that the constitutional provision "'is to be construed liberally to uphold proper legislation, all parts of which are reasonably germane.' [Citation.]" (*FPPC, supra,* at p. 38.) Or, as stated in *Brosnahan v. Brown, supra,* "'an initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are "reasonably germane" to each other' and to the general purpose or object of the initiative.' [Citations.]" (32 Cal.3d at p. 245.)

In its most recent discussion of article II, section 8, subdivision (d) the Supreme Court reviewed initiatives which survived single-subject attacks in the *Brosnahan, FPPC* and *Amador* decisions. (See *Harbor v. Deukmejian, supra,* at pp. 1098-1099.) From that discussion, it is apparent that initiatives encompassing a wide range of diverse measures will withstand challenge so long as their provisions are "either functionally related to one another or . . . reasonably germane to one another or the objects of the enactments." (*Id.,* at p. 1100.) But in *Harbor* and *Brosnahan* the court cautioned that "proponents of initiative measures do not have 'blank checks' to draft measures containing unduly diverse or extensive provisions bearing no reasonable relationship to each other or to the general object which is sought to be promoted.'" (*Id.,* at p. 1099; *Brosnahan v. Brown, supra,* 32 Cal.3d at p. 253.)

Although, article II, section 8, subdivision (d) does not expressly require that the subject of an initiative be stated in its title (*Harbor v. Deukmejian, supra,* 43 Cal.3d at p. 1098), its singleness may be determined by the extent to which its provisions are germane to the general subject as expressed in its title and within the field of legislation suggested thereby. (*Perry v. Jordan* (1949) 34 Cal.2d 87, 93 [207 P.2d 47]; accord *FPPC, supra,* 25 Cal.3d at p. 38.) The connection between the substance of an initiative's provisions and its "general object" as explained in its preamble and title was recently reiterated in *Brosnahan v. Brown, supra,* 32 Cal.3d at pages 246-247.

▉ Here, the general object and purpose of the initiative, as stated in its title and in its section 3, quoted above, is to rein in the constantly increasing premiums charged to California purchasers of liability insurance. Among the means by which this is to be accomplished is the establishment of a "no fault" system of automobile insurance placing limitations on the

awards available to injured persons, controlling attorneys' contingency fees, requiring arbitration of disputed claims, and "rolling back" premiums for a two-year period. The connection between these stated purposes and section 8, which relates exclusively to the subject of campaign contributions and conflicts of interest of elected officials who receive such contributions, is not readily apparent.

Association asserts that section 8 is germane to the remainder of the initiative because it guarantees the rights of individuals and entities involved in the insurance industry to participate on an "equal" basis in the political process. We question whether such an assurance of participation is logically related to the stated objective of reducing the cost of insurance. In fact, one might well argue that by exempting the insurance industry from certain present or future restraints on its ability to influence legislators and other elected officials, it becomes equally probable that the result will be *increased* consumer costs as a result of governmental actions favorable to insurers' profit margins.[3] However, even assuming subdivision (a) of section 8 dealing with campaign contributions is germane to the stated purpose of the measure, it is clear subdivision (b) is not. Neither in the briefs nor at oral argument did the initiative's backers essay to explain how subdivision (b) exempting "public officials" from rules which would otherwise disqualify them from acting in matters affecting the interests of their campaign contributors, would operate to advance the initiative's announced purpose of controlling spiralling insurance costs. Nor do we perceive a reasonable connection between subdivision (b) and the stated purpose of the initiative.

Association calls our attention to the undeniably liberal nature of the standards which have been formulated in such cases as *Brosnahan, FPPC,* and *Amador.* It follows from the reasoning of these authorities, Association argues, that since the initiative deals generally with the regulation of insurance industry practices and section 8 relates to a specific aspect of those

---

[3] We asked the parties to submit letter briefs detailing what effect, if any, section 8 of the initiative would have on current law. From the thorough and helpful responses we gather there would be little immediate change in present state election laws but that, depending on how several ambiguous phrases in the text of proposed section 12901.5 were construed, some local enactments regulating political contributions and conflict of interest disqualifications might be subject to question. We note, however, that section 8 would clearly alter present state law insofar as other provisions of the initiative prohibit its amendment except by a two-thirds vote of the Legislature. Thus, the power to impose future restrictions on contributions and voting rights would in fact be subjected to restraints not now in existence.

However, these factors are, as petitioners point out, essentially irrelevant to the question of whether section 8 violates the single-subject rule. Equally insignificant is the speculation by the parties that section 8 might have been included in the initiative in anticipation that other initiatives which deal unacceptably with the subject of section 8 might be circulated.

practices, the latter section ipso facto satisfies the "reasonably germane" test. First, the express purpose of the initiative is to control the cost of insurance, not generally to regulate the practices of the insurance industry. Second, we cannot accept the implied premise of Association's analysis, i.e., that any two provisions, no matter how functionally unrelated, nevertheless comply with the constitution's single-subject requirement so long as they have in common an effect on any aspect of the business of insurance. Contemporary society is structured in such a way that the need for and provision of insurance against hazards and losses pervades virtually every aspect of life. Association's approach would permit the joining of enactments so disparate as to render the constitutional single-subject limitation nugatory.

The objectionable nature of section 8 becomes even more apparent when it is considered in light of one of the primary electoral abuses the single-subject rule is aimed at ameliorating. ▮▮▮ "Among other purposes, the single-subject requirement was enacted to minimize the risk of voter confusion and deception." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 231.) Indeed, the risk of confusion is not confined to those who vote upon initiative measures which appear on the ballot. It extends also to those who sign the sponsoring petition. As stated in the ballot argument in favor of the predecessor provision to the single-subject limitation of article II, section 8, subdivision (d): "Protection is also given to those individuals who sign the sponsoring petition. People requested to sign the sponsoring petition will readily understand just what the entire proposition is and not be confused or misled by a maze of unrelated matters some of which are inadequately explained, purposely distorted, or intentionally concealed." (Ballot Pam., Proposed Amend. to Cal. Const. with arguments to voter Gen. Elec. (Nov. 2, 1948) arguments in favor of Prop. 10, p. 8.) Thus article II, section 8, subdivision (d) forbids submission of an initiative violative of the single-subject limitation "to the electors." The term "elector" includes all those who are qualified to vote and thus qualified to sign a sponsoring petition whether or not they actually exercise their right to vote. (*Kagen* v. *Kearney* (1978) 85 Cal.App.3d 1010, 1015 [149 Cal.Rptr. 867].)

▮▮▮ In our view, section 8 of the initiative is a paradigm of the potentially deceptive combinations of unrelated provisions at which the constitutional limitation on the scope of initiatives is aimed. It is located, as previously described, near the middle of a 120 page document, and consists of two brief paragraphs which bear no connection to what precedes or follows. Section 8 would enact a new section of the Insurance Code, section 12901.5, and position it in the code immediately following a section dealing with

funding for a "Bureau of Fraudulent Claims," and immediately preceding a new section 12924.5, relating to the presentation of evidence and payment of costs and legal fees in administrative proceedings before the Insurance Commissioner. We believe it extremely unlikely that the average voter or signer of a sponsoring petition, or even one more conscientious and sophisticated, would take the time to study the initiative in such detail as to discover this obscure campaign funding provision.

The significant threat that voters will be misled as to the breadth of the initiative is heightened by the absence of any reference to section 8 in the Attorney General's title and summary, or in the introductory statement of findings and purpose in the initiative itself, set forth in full above. In the present case, not only is there a lack of any reasonably discernible nexus between the stated object of the initiative and the campaign spending and conflict of interest provisions of section 8, but the title and various descriptions of the initiative's contents give no clue that any such provisions are buried within. These flaws are fatal.

The parties, in their briefs, devote much energy to debating whether section 8 of the initiative, properly construed, applies only to consumer protection organizations and trade associations which are "insurance related" or more broadly to any such organization or association regardless of its area of substantive concern. We find it unnecessary to enter this debate since our conclusion that the initiative, by virtue of its inclusion of section 8, violates the single-subject standard would be the same even if the narrower interpretation urged by Association were adopted. For the same reason, we do not resolve the parties' disagreement about whether section 8 would affect only contributions to, and disqualifications of, state officers, or would also apply to local officials.

### III

▰ Having determined that the inclusion of section 8 in the initiative transgresses the constitutional single-subject limitation, we next address the assertion of Association that the initiative can be rescued by the simple expedient of severing the offending provision. While severance of particular parts of an initiative measure has been recognized as a permissible remedy in a few cases, these involved circumstances where the excised provisions were invalid because they conflicted with substantive constitutional protections or prohibitions. (See *FPPC* v. *Superior Court, supra,* 25 Cal.3d at p. 49; *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 332 [118

Cal.Rptr. 637, 530 P.2d 605].) Moreover, the language and context of article II, section 8, subdivision (d), preclude judicial surgery to cure single-subject violations. "In 1948, California adopted a single subject constitutional provision applicable to initiatives. It states that an initiative measure embracing more than one subject may not be submitted to the electors or have any effect . . . and it does not incorporate in the same sentence the requirement that the subject must be expressed in the title; *nor does it contain a provision for severance in the event more than one subject is included in the measure.*" (*Harbor* v. *Deukmejian, supra,* 43 Cal.3d at p. 1098; italics added.) This omission is in stark contrast to article IV, section 9 of the Constitution, which deals with legislative enactments. It provides: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. . . ." *Wallace* v. *Zinman* (1927) 200 Cal. 585 [254 P. 946, 62 A.L.R. 1341], upon which Association relies in advocating severance is inapposite here, in that it was decided prior to the 1948 adoption of the predecessor of article II, section 8, subdivision (d). The present constitutional language leaves no room for argument; it unambiguously states that an initiative encompassing more than one subject shall have no effect. Its wording defies a construction that only some parts shall be denied effect.

## IV

■■■■ We hold that section 8 is neither reasonably germane nor functionally related to the stated general object of the initiative or to its other provisions. Since article II, section 8, subdivision (d) prohibits such an overbroad measure from being submitted to the electors or having any effect, we are compelled to grant the relief sought by petitioners.

We have previously advised the parties that we were contemplating the issuance of a peremptory writ of mandate in the first instance, but have afforded them the opportunity first to present both written and oral arguments. Having considered the briefs and arguments of the parties, we are authorized to dispense with the alternative writ and grant the petition forthwith. (See *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a peremptory writ of mandate issue directing respondents to refrain from taking any steps to verify signatures on qualifying petitions, to certify or to place on the ballot the initiative measure transmitted by the Secretary of State to all registrars of voters or county clerks on January 26, 1988,

under the heading: "Motor Vehicles and Other Insurance. Initiative Statute." Pursuant to California Rules of Court, rule 24 (d), this decision shall become final as to this court immediately upon filing.

Carr, J., and Sims, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied May 5, 1988. Lucas, C. J., and Eagleson, J., were of the opinion that the petition should be granted.