Filed 10/23/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ONE TECHNOLOGIES, LLC, | B318787 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV21844) |
| v. | |
| FRANCHISE TAX BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge. Affirmed.

Dakessian Law, Mardiros H. Dakessian and Michael P. Penza for Plaintiff and Appellant.

Rob Bonta, Attorney General, Tamar Pachter, Assistant Attorney General, Brian D. Wesley and Anna Barsegyan, Deputy Attorneys General, for Defendant and Respondent.

———————————————

Proposition 39, enacted by voters in 2012, established a program to promote the creation of clean energy jobs. To fund this program, the proposition raised taxes on some multistate businesses by eliminating the option to apportion California tax based on a combination of a business's California property, payroll, and sales. Instead, under Proposition 39, a multistate business must apportion its tax based on a single factor—in-state sales. The proposition further provided for cable companies spending $250 million or more in California on certain expenditures to exclude half of their in-state sales when apportioning, thus lowering their tax burden under the single-factor tax regime.

In 2017, plaintiff One Technologies, LLC, a Texas-based provider of credit score and credit reporting services, paid tax to California calculated under the single-factor method. Plaintiff then filed a complaint for refund against defendant and respondent Franchise Tax Board (the Board). Plaintiff alleged Proposition 39 was invalid under the single-subject rule for ballot initiatives, because the special tax treatment for cable companies had no reasonable connection to the proposition's purpose of funding the creation of clean energy jobs, and therefore the proposition impermissibly addressed two unrelated subjects. The trial court disagreed and sustained the Board's demurrer.

We hold Proposition 39 did not violate the single-subject rule. The purpose of the proposition was to fund a clean energy job creation program by raising taxes on some multistate businesses. The provisions of the proposition were both reasonably germane and functionally related to that purpose, because those provisions established a funding mechanism and the means of directing that funding to clean energy job creation.

2

The special rules for cable companies reflect a determination by the proposition's drafters that some businesses should bear the funding burden more than others, but that is still within the scope of the proposition's purpose. We reject plaintiff's contentions that the ballot materials for Proposition 39 were deceptive or that the proposition constituted "logrolling."

Accordingly, we affirm.

## BACKGROUND

### 1. *Taxation of multistate businesses prior to Proposition 39*

"When a business earns income in multiple jurisdictions, apportionment is necessary to avoid tax duplication or other inequity." (*The Gillette Co. v. Franchise Tax Bd.* (2015) 62 Cal.4th 468, 473.) In California, the Uniform Division of Income for Tax Purposes Act (Rev. & Tax. Code,[1] § 25120 et seq.) governs the apportionment of taxable income earned by multistate businesses, that is, businesses that earn a portion of their income in the state and a portion outside the state. (*Ibid.*; see §§ 25101, 25128, subd. (d)(6) [defining an "[a]pportioning trade or business" as, inter alia, one whose income "is derived from or attributable to sources both within and without the state"].)

Prior to the enactment of Proposition 39, multistate businesses, with certain exceptions, could choose between two

---

[1] Further unspecified statutory citations are to the Revenue and Taxation Code.

3

apportionment methods.[2]  The first method was based on three factors:  (1) the value of the business's real and personal property owned or rented in the state, (2) the amount of the business's payroll paid in the state, and (3) the business's sales in the state.  (§§ 25128, subd. (a), 25129, 25132, 25134.)  Under this three-factor apportionment method, sales, except for sales of tangible personal property,[3] were deemed to be "in this state" if "[t]he income-producing activity" was performed entirely in the state, or more of "[t]he income-producing activity" was performed in the state than in any other jurisdiction.  (Former § 25136, subds. (a)(1)–(2) (Stats. 2010, ch. 721, § 27).)

The second apportionment method was based on a single factor, the business's sales in the state.  (Former § 25128.5, subds. (a)–(b) (Stats. 2009, ch. 544, § 8).)  Under this method, in-state sales were defined differently than under the three-factor apportionment method.  Rather than basing sales on where the "income-producing activity" was "performed" (former § 25136, subd. (a)), the single-factor apportionment method based sales on the location of the purchaser or the purchased property.  Specifically, sales for services were considered in-state "to the extent the purchaser of the service received the benefit of the

_____

[2]  Both before and after Proposition 39, multistate agricultural, extractive, savings and loan, and banking and financial businesses have had to apportion their tax liability using a three-factor method specific to those industries.  (§ 25128, subds. (b), (c).)  These businesses could not and cannot choose a single-factor apportionment method.

[3]  Sales of tangible personal property are governed by section 25135, which was not affected by Proposition 39 and is not at issue in this case.

4

service in this state," and sales of intangible property were considered in-state "to the extent the property is used in this state." (Former § 25136, subd. (b)(1)–(2).) Similarly, "[s]ales from the sale, lease, rental, or licensing of real property" and "[s]ales from the rental, lease, or licensing of tangible personal property" were considered in-state if the property was located in the state. (*Id.*, subd. (b)(3)–(4).)

## 2. *Proposition 39*

Voters approved Proposition 39 in the November 6, 2012 general election. As expressed in the proposition's findings and declarations, its drafters were concerned that the state's apportionment scheme "discourages multistate companies from locating jobs in California, and puts job-creating California companies at a competitive disadvantage." The drafters noted that, "[t]o address this problem, most other states have changed their laws to tax multistate companies on the percent of sales in that state, a tax approach referred to as the 'single sales factor.' " The drafters declared that according to the Legislative Analyst's Office, adopting the single sales factor approach would increase state revenues "by as much as $1.1 billion per year and create a net gain of 40,000 California jobs." Further, "by dedicating a portion of increased revenue to job creation in the energy efficiency and clean energy sectors, California can create tens of thousands of additional jobs right away," and "[a]dditional revenue would be available to public schools consistent with current California law." (Prop. 39, § 1.)

Accordingly, Proposition 39 amended the Revenue and Taxation Code to remove three-factor apportionment as an option, thus requiring multistate businesses that previously could choose between three-factor and single-factor

5

apportionment to calculate their California tax liability using single-factor apportionment, with in-state sales determined based on the location of the purchaser or the purchased property. (§§ 25128.7, 25136; Prop. 39, §§ 6, 8.)[4]

Proposition 39 did not impose the single-factor apportionment method equally across all multistate businesses that previously could choose to calculate their tax under the three-factor method.  The proposition placed a lower tax burden on certain companies operating "cable systems" and meeting other criteria.  (§ 25136.1, subds. (a)(1), (b)(1)–(2); Prop. 39, § 9.) Specifically, for purposes of determining their in-state sales, qualified cable companies could treat 50 percent of their in-state sales as out-of-state, thus reducing their California taxable income.  (§ 25136.1, subd. (a)(1).)  To qualify for this reduced tax burden, a cable company must make "expenditures attributable to this state" of at least $250 million for "tangible property, payroll, services, franchise fees, or any intangible property distribution or other rights."  (§§ 25136.1, subds. (b)(2)(A), (C)(5)–(6).)

In addition to amending the Revenue and Taxation Code, Proposition 39 added a new Division 16.3 to the Public Resources Code.  (Prop. 39, § 2.)  This division created the Clean Energy Job Creation Fund (Job Creation Fund), and directed that it be funded with $550 million from the general fund for each of the subsequent five fiscal years from 2013 to 2017.  (Pub. Resources Code, § 26205.)  In the event the estimated annual increase in

---

[4] Proposition 39 repealed former sections 25128.5 and 25136 as of December 1, 2013, and expressly limited the three-factor apportionment method under section 25128 to taxable years prior to January 1, 2013.  (Prop. 39, §§ 4–5, 7.)

revenue from the tax changes enacted under Proposition 39 fell short of $1.1 billion per year, as determined by the Department of Finance and the Legislative Analyst, "the amount transferred to the Job Creation Fund shall be decreased to an amount equal to one-half of the estimated annual increase in revenues" generated by Proposition 39. (Pub. Resources Code, § 26208.) Division 16.3 listed the types of projects to be funded by the Job Creation Fund, outlined certain criteria for those projects, and created a Citizens Oversight Board to monitor the fund's expenditures. (Pub. Resources Code, §§ 26205, subds. (a)–(c), 26206, 26210.)

3.    *Proposition 39 ballot materials*

The Attorney General's official title for Proposition 39 was "Tax Treatment for Multistate Businesses. Clean Energy and Energy Efficiency Funding. Initiative Statute." (Voter Information Pamp., Gen. Elec. (Nov. 6, 2012) Attorney General's Official Title and Summary for Prop. 39, p. 68 (Voter Guide), boldface & some capitalization omitted.) Its drafters named it "The California Clean Energy Jobs Act." (Voter Guide, text of Prop. 39, p. 125).)

The Attorney General's summary explained that the proposition would (1) require multistate businesses to calculate their tax liability based on their percentage of California sales, (2) repeal existing law allowing businesses to "choose a tax liability formula that provides favorable tax treatment for businesses with property and payroll outside California" (i.e., three-factor apportionment), and (3) dedicate $550 million annually for five years from the anticipated increase in revenue to fund projects "that create energy efficiency and clean energy jobs in California." (Voter Guide, Attorney General's Official Title & Summary for Prop. 39, p. 68.) The Attorney General

7

summarized the Legislative Analyst's estimate of fiscal impact, stating there would be an increase of approximately $1 billion in annual revenues, "growing over time," because the elimination of the three-factor apportionment formula "would result in some multistate businesses paying more state taxes." (*Ibid.*) About half of the increased revenue over the subsequent five years "would be dedicated to energy efficiency and alternative energy projects," and "a significant portion" of remaining revenues "likely would be spent on public schools and community colleges." (*Ibid.*)

The Legislative Analyst's analysis of Proposition 39 began with a summary of then-current law, describing the three-factor and single-factor apportionment methods and stating that multistate businesses could "choose the method that is most advantageous to them for tax purposes." (Voter Guide, Legislative Analyst's analysis of Prop. 39, pp. 68–69.) The Legislative Analyst briefly described existing state programs to reduce energy consumption, and further explained how under certain provisions of state law an increase in state tax revenues could lead to the Legislature increasing the "minimum guarantee" for public school funding. (*Id.* at p. 69.)

The Legislative Analyst then explained that under Proposition 39, multistate businesses would no longer be able to choose the most advantageous apportionment method, and instead would be subject to the single-factor method. (Voter Guide, Legislative Analyst's analysis of Prop. 39, p. 69.) The Legislative Analyst stated, "This measure also includes rules regarding how all multistate businesses calculate the portion of some sales that are allocated to California for state tax purposes.

8

*These include a set of specific rules for certain large cable companies*." (*Ibid.*, italics added.)

The Legislative Analyst described the Clean Energy Job Creation Fund and how it would be funded for five years by half of the revenues "raised by moving to a mandatory single sales factor." (Voter Guide, Legislative Analyst's analysis of Prop. 39, p. 70.) The Legislative Analyst provided a chart indicating the estimated effects of Proposition 39 on state revenues and spending. The Legislative Analyst also explained "[t]he increased revenues would come from some multistate businesses paying more taxes." (*Id.* at pp. 70–71.) In addition to funding the Job Creation Fund, the Legislative Analyst explained that the increased revenue would be considered in calculating the annual minimum guarantee for school funding, likely increasing that guarantee by hundreds of millions of dollars. (*Id.* at p. 71.)

The voter information guide contained the full text of Proposition 39, which consisted of approximately four and a half pages of double-column text. (Voter Guide, text of Prop. 39, pp. 125–129.)

### 4. *Complaint and demurrer*

On June 11, 2021, plaintiff filed a complaint against the Board challenging the validity of Proposition 39 and demanding a tax refund for 2017.

Plaintiff alleged the following: Plaintiff is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas. In 2017 it "sold credit-score and credit-report services directly to consumers throughout the United States, including in the State of California." Using single-factor apportionment, plaintiff paid $31,574 in California taxes for that year, plus $7.05 in interest and $812.29 in penalties

9

related to estimated tax payments. After paying its taxes, plaintiff recalculated its tax liability using the three-factor apportionment method repealed by Proposition 39. Under that method, plaintiff owed nothing in California taxes apart from a minimum franchise tax liability of $800. Plaintiff subsequently claimed a tax refund, a claim the Board implicitly rejected by not responding.

Plaintiff alleged it was entitled to choose three-factor apportionment because Proposition 39 violated the single-subject rule for ballot initiatives and therefore was invalid. Specifically, plaintiff alleged Proposition 39 consisted of three components— the Clean Energy Job Creation Fund, the elimination of three-factor apportionment, and the provision reducing tax liability for cable companies, which plaintiff dubbed the "Cable Company Tax Break." Plaintiff claimed "no single subject, object, or purpose unites" these three components. Assuming the purpose of the proposition was to raise revenue to create clean energy jobs, plaintiff contended the "Cable Company Tax Break" had no relation to that purpose because it would reduce, not increase, revenue. If instead the purpose of the proposition was to modify the taxation scheme for multistate businesses, plaintiff claimed the Job Creation Fund was unrelated to that purpose.

The Board demurred to the complaint, arguing that "[e]ach of [Proposition 39's] provisions [is] clearly functionally related to, and promote[s], the initiative's purpose by changing the tax treatment of multistate companies to generate increased revenue, approximately 50% of which was used to fund additional jobs in the energy efficiency and clean energy sectors for a period of five years." The Board contended the reduced tax burden on cable companies spending $250 million or more in the state "was

10

auxiliary to, and promoted the main purpose of Proposition 39 by providing a comprehensive tax reform package for multistate businesses which would generate sufficient revenue to fund the [Job Creation Fund]." To the extent the special cable company rules reduced the revenue that otherwise might be available, the Board argued it was beyond the trial court's purview to evaluate the wisdom of a particular provision of an initiative, particularly when the Legislative Analyst had determined Proposition 39 "*as a whole*[ ] would increase state revenues."

Plaintiff opposed the demurrer, reasserting its contention that Proposition 39 violated the single-subject rule, and further arguing the inclusion of the special tax rules for cable companies was "deceptive" and constituted "logrolling."

The trial court sustained the Board's demurrer without leave to amend, concluding Proposition 39 did not violate the single-subject rule. The court found the changes to taxation of multistate businesses under Proposition 39 were related to the Job Creation Fund because the former funded the latter. The special rules for cable companies spending $250 million or more in the state were part of the overall tax reform, and the requirement that those companies meet the $250 million expenditure requirement to qualify for tax reduction "would encourage, not discourage, them from locating jobs in California." The court found the efficacy of the cable company provision was not a proper concern in evaluating a single-subject challenge, nor was the inclusion of that provision deceptive.

The trial court entered judgment in favor of the Board on February 3, 2022. Plaintiff timely appealed.

11

## STANDARD OF REVIEW

" 'We independently review [a] ruling on a demurrer and determine de novo whether the pleading alleges facts sufficient to state a cause of action.' [Citation.] '[W]e accept as true the well-pleaded allegations in [the] . . . complaint. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]' " ' [Citation.] ' "We are not bound by the trial court's reasoning and may affirm the judgment if correct on any theory." ' [Citation.]" (*Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230, 264.)

We review the trial court's decision not to grant leave to amend for abuse of discretion. (See *Childhelp, Inc. v. City of Los Angeles* (2023) 91 Cal.App.5th 224, 235.) " '[W]e must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect.' [Citations.]" (*Ibid.*)

## DISCUSSION

### A.     The Single-subject Rule

The single-subject rule arises from article II, section 8, subdivision (d) of the California Constitution, which provides, "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." "Among other purposes, the single-subject requirement was enacted to minimize the risk of voter confusion and deception." (*Amador*

12

*Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231.)

Because "the initiative process occupies an important and favored status in the California constitutional scheme," "the single-subject requirement should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern." (*Briggs v. Brown* (2017) 3 Cal.5th 808, 828 (*Briggs*).) " ' "[T]he Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people." ' [Citations.]" (*Id.* at p. 827.) "We have declared it 'our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise.' [Citation.]" (*Ibid.*) " ' "[A]ll presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." [Citations.] If the validity of the measure is "fairly debatable," it must be sustained. [Citations.]' [Citation.]" (*Id.* at p. 828.)

Applying the above principles, our Supreme Court has identified two tests for compliance with the single-subject rule. Under the first test, " ' " '[a]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are "reasonably germane" to each other,' and to the general purpose or object of the initiative. [Citations.]" ' [Citation.] The 'reasonably germane' standard is applied 'in an accommodating and lenient manner so as not to unduly restrict . . . the people's right to package provisions in a

13

single bill or initiative.' [Citations.]" (*Briggs, supra,* 3 Cal.5th at pp. 828–829, italics omitted.) Our high court has clarified that the requirement that an initiative's parts be germane to *one another* as well as the overall purpose of the initiative is not in fact a distinct requirement—rather, "a measure's separate provisions have been considered to be reasonably germane *to each other* within the meaning of the standard so long as *all* of the provisions are reasonably germane to a single common theme, purpose, or subject." (*Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764, fn. 29.)

Under the second test, an initiative complies with the single-subject rule if its provisions are "functionally related." (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1100 (*Harbor*) ["a measure complies with the [single-subject] rule if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment"];[5] see *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 249 (*Brosnahan*) [interdependent provisions are "one type of multifaceted legislation which would meet the single subject test," italics omitted].)

In applying the single-subject rule, " ' "We do not consider or weigh the economic or social wisdom or general propriety of

---

[5] *Harbor* concerned the single-subject rule applicable to legislative enactments, but it derived the "functionally related" test from case law concerning the single-subject rule for ballot initiatives. (See *Harbor, supra,* 43 Cal.3d at pp. 1095, 1098–1100.) *Harbor* cited authority that "the same principles apply to the single subject rule relating to initiatives as to legislative enactments." (*Id.* at p. 1098, citing *Perry v. Jordan* (1949) 34 Cal.2d 97, 92–93.)

14

the initiative. Rather, our sole function is to evaluate [it] legally in the light of established constitutional standards." ' [Citations.]" (*Briggs*, *supra*, 3 Cal.5th at p. 828.)

## B.     Proposition 39 Does Not Violate the Single-subject Rule

The purpose of Proposition 39 was to fund a clean energy job creation program by raising taxes on some multistate businesses. This purpose was reflected in the Attorney General's official title, "Tax Treatment for Multistate Businesses. Clean Energy and Energy Efficiency Funding. Initiative Statute." (Boldface & some capitalization omitted.) The provisions of Proposition 39 were " 'reasonably germane' " to this purpose (*Briggs*, *supra*, 3 Cal.5th at p. 829), because they provided the mechanisms to raise tax revenues and direct them to clean energy job creation. Similarly, those provisions were "functionally related," because the changes to multistate business taxation funded the clean energy jobs program. (*Harbor*, *supra*, 43 Cal.3d at p. 1100.)

In its opening brief on appeal, plaintiff concedes that "[i]f the subject of Proposition 39 were the creation of clean energy jobs," then "[t]he Clean Energy Fund is germane to the creation of clean energy jobs; so too is the elimination of three-factor apportionment, as this generates the revenue that supports the Clean Energy Fund." Plaintiff argues, however, that the special tax treatment for cable companies under section 25136.1 is not reasonably germane to the creation of clean energy jobs, because that provision reduces revenue that otherwise would be available for the clean energy jobs program.

Given " 'our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of

15

its exercise[,]' [citation]" (*Briggs, supra*, 3 Cal.5th at p. 827), we reject plaintiff's parsing of Proposition 39. As set forth in our Background, *ante*, Proposition 39 enacted a funding method for clean energy job creation through what is effectively a tax increase. In devising that funding method, Proposition 39's drafters chose to place the burden of that tax increase on particular taxpayers, specifically multistate businesses that previously had chosen three-factor apportionment to calculate their California tax. The drafters further decided not to impose that burden evenly across all multistate businesses that previously could elect three-factor apportionment; the drafters allowed cable companies expending $250 million or more in the state to reduce their in-state sales figure by half for taxation purposes. Why the drafters chose this approach, and the wisdom of it, are beyond the scope of a single-subject challenge. (*Briggs, supra*, at p. 828 [" ' "We do not consider or weigh the economic or social wisdom or general propriety of the initiative" ' "].) One reasonably may speculate, however, that the drafters were concerned the change in the tax scheme would have unintended, collateral consequences for cable companies, and section 25136.1 was their solution to mitigate those consequences. What plaintiff characterizes as a tax break is just one of many decisions the drafters made when determining who should pay for the clean energy jobs program, and how much each should contribute.[6]

---

[6] Arguably, the purpose of Proposition 39 could be characterized more broadly as "job creation," not just clean energy job creation, in which case section 25136.1, which rewards cable companies with payroll in California, might be consistent with this purpose. Plaintiff argues, however, that Proposition 39 and its ballot materials did not "fairly disclose" general job

16

Plaintiff argues section 25136.1 cannot be viewed simply as a component of the elimination of three-factor apportionment enacted under Proposition 39 because section 25136.1 "was not intertwined with or a necessary result of eliminating three-factor apportionment . . . ." This is simply a rearticulation of plaintiff's argument that because section 25136.1 reduces tax revenue that might otherwise be available for the clean energy jobs program, it violates the single-subject rule, an argument we have rejected.

Citing *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 253–254 (*Kennedy Wholesale*), plaintiff argues that "revenue-raising and revenue-spending provisions, if included in the same initiative, must relate to the same subject." Under this principle, plaintiff contends, "An initiative cannot contain taxing provisions addressing one subject (*e.g.*, multistate taxation), and then use the revenue generated by the tax provisions to address a second, unrelated subject (*e.g.*, clean energy jobs)."[7] Plaintiff misreads *Kennedy Wholesale*.

*Kennedy Wholesale* concerned a single-subject challenge to Proposition 99, the Tobacco Tax and Health Protection Act of 1988, which "increases the tax on cigarettes and other tobacco

---

creation as its purpose. Plaintiff further contends "job creation" is too broad a subject to satisfy the single-subject rule. Given our conclusion that Proposition 39 satisfies the single-subject rule even if its purpose is limited to the creation of clean energy jobs, we need not reach plaintiff's contentions.

[7] We observe that this argument, which plaintiff asserts in its reply brief, would appear to contradict plaintiff's concession in its opening brief that elimination of three-factor apportionment is germane to the creation of clean energy jobs under Proposition 39.

17

products and allocates the resulting revenue to various tobacco-related problems." (*Supra*, 53 Cal.3d at pp. 248, 253.) Briefly summarized, the proposition specified that the revenues from this tax "be appropriated" for a spectrum of causes, including school and community health education programs, tobacco-related medical research, medical care for those who could not afford that care and did not have coverage from private or government sources, fire prevention, environmental conservation, protection of wildlife habitat areas, and enhancement of " 'state and local park and recreation purposes.' [Citation.]" (*Id.* at p. 254.)

The challenger "argue[d] that Proposition 99 violates the single-subject rule because the measure does not guarantee that *every expenditure* from the fund will be related to tobacco use. To illustrate, moneys from the fund may in some cases be spent to assist indigent medical patients whose health problems are not due to smoking and to improve state parks that have not been damaged by fire." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 254.)

Our high court rejected this argument. "Obviously, it is possible to imagine expenditures that would fall within Proposition 99's spending categories without addressing tobacco-related problems. However, the measure's spending provisions direct new revenues more precisely to tobacco-related problems than if the electorate had simply omitted any such provisions. We do not believe the voters' failure to require even greater precision invalidates the measure, since it is well established that an initiative may have 'collateral effects' without violating the single-subject rule." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 254.)

18

*Kennedy Wholesale* stands for the principle that an initiative survives a single-subject challenge even if it does not ensure that all revenue raised is directed at expenditures related to the initiative's overall purpose. The case does not hold, or even address, whether the funding mechanism itself must relate to the initiative's purpose. True, the funding mechanism of the initiative at issue in *Kennedy Wholesale*—an increase in tax on tobacco products—related to the overall purpose of the initiative—mitigating tobacco-related problems. The Supreme Court, however, at no point suggested such concordance is constitutionally required. Indeed, it rejected the challenger's single-subject attack even though the funds raised by the tobacco product tax could be used for causes arguably not related to tobacco products, for example, protection of wildlife habitat and enhancement of state and local recreational parks. *Kennedy Wholesale* therefore does not undercut our conclusion that increasing taxes on multistate businesses is reasonably germane and functionally related to the creation of clean energy jobs when the former is used to fund the latter.

Plaintiff argues the inclusion of special tax treatment for cable companies in Proposition 39 was "deceptive." Plaintiff notes the "Cable Company Tax Break," as plaintiff refers to it, was not mentioned in the proposition's findings and declarations, the proposition's official or proposed titles, the Attorney General's summary, or the arguments for or against the proposition in the voter information guide. Although the Legislative Analyst's analysis mentioned the "set of specific rules for certain large cable companies," plaintiff argues this was insufficient to apprise voters of the significance or content of those rules. Further, plaintiff argues the Legislative Analyst did not calculate the

19

fiscal impact of section 25136.1, which would have alerted voters that the special tax treatment for cable companies would lead to a loss in revenue.  Plaintiff also objects that the argument in favor of Proposition 39 characterized three-factor apportionment as a "loophole," without disclosing the proposition would enact a new "loophole" for cable companies.

As an initial matter, we note plaintiff does not argue that the Attorney General's title and summary, the Legislative Analyst's analysis, or the voter guide arguments in favor of Proposition 39 were legally improper or deficient, and to the extent plaintiff so implies, it cites no supporting authority.  We therefore have no basis to question the legal validity of those materials.

Our Supreme Court has not looked favorably on arguments that in approving an initiative, "the voters must have been misled or confused"—arguments which are "based upon the improbable assumption that the people did not know what they were doing." (*Brosnahan, supra,* 32 Cal.3d at p. 252.)  Rather, courts " 'ordinarily should assume that the voters who approved a [ballot proposition] ". . . have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to have duly considered." ' [Citations.]" (*Ibid.*, italics omitted.)  "Our society being complex, the rules governing it whether adopted by legislation or initiative will necessarily be complex," and voters "may not be limited to brief general statements but may deal comprehensively and in detail with an area of law." (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 41–42 (*Fair Political Practices.*)  "Unless we

20

are to repudiate or cripple use of the initiative, risk of confusion must be borne." (*Id.* at p. 42.)

Here, the whole of Proposition 39 was laid out in four and a half pages in the voter information guide, a reasonable length to expect voters to read. Like many laws, the language could be described as technical or complex and might not be easy for a layperson to comprehend, but as our high court has stated, we may expect voters to "deal comprehensively and in detail with an area of law," lest we "repudiate or cripple use of the initiative." (*Fair Political Practices*, *supra*, 25 Cal.3d at pp. 41–42.) The Legislative Analyst, moreover, expressly flagged the "specific rules for certain large cable companies," thus alerting voters to review the proposition's language for those provisions. Proposition 39 was neither deceptive nor confusing and thus does not raise a constitutional concern.

Plaintiff relies on *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351 (*California Trial Lawyers*), abrogated on other grounds by *Lewis v. Superior Court* (1999) 19 Cal.4th 1232 to argue "Proposition 39's inclusion of the Cable Company Tax Break was deceptive." (Boldface omitted.) *California Trial Lawyers* does not assist plaintiff's challenge to Proposition 39.

*California Trial Lawyers* addressed a single-subject challenge to a proposed initiative entitled the " 'Insurance Cost Control Initiative of 1988.' " (*California Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 354.) The appellate court issued a writ of mandate prohibiting placing the initiative on the ballot because the initiative's section 8, regarding campaign contributions and conflicts of interest, rendered the initiative invalid under the single-subject rule.

21

The initiative was "lengthy, covering 120 typewritten pages and consisting of 67 sections." (*California Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 355.) "[T]he general object and purpose of the initiative, as stated in its title and [a provision of the initiative entitled "*Purpose*"] [was] to rein in the constantly increasing premiums charged to California purchasers of liability insurance." (*Id.* at pp. 356, 358.) To achieve this purpose, the initiative proposed, inter alia, to establish a "no fault" system of automobile insurance, control attorney contingency fees, require arbitration of disputed claims, and roll back premiums for a two-year period. (*Id.* at pp. 358–359.)

Section 8 of the initiative would have added a section to the Insurance Code providing, " 'Any consumer protection organization, insurer, licensee, or trade association shall have no greater or lesser right to make any campaign contributions to any public official than is enjoyed by any other citizen of this state.' " (*California Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 356.) The proposed new section would also have provided, " 'Any elected state official who receives any lawful campaign contribution from or the benefit of any expenditure made by any consumer protection organization, insurer, licensee, or trade association shall not be disqualified thereby from participating in any decision affecting any interest of the donor.' " (*Ibid.*)

The Court of Appeal agreed with the proposition's challengers that section 8 of the initiative, "which relates exclusively to the subject of campaign contributions and conflicts of interest of elected officials who receive such contributions," was not reasonably germane to the proposition's stated purpose of controlling insurance costs. (*California Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 359.) The court reasoned that section 8

22

could not be harmonized with the other provisions on the asserted justification that they all related to the subject of "the regulation of insurance industry practices." (*Id.* at pp. 359–360.) That "approach would permit the joining of enactments so disparate as to render the constitutional single-subject limitation nugatory." (*Id.* at p. 360.)

The court further held that section 8 "is a paradigm of the potentially deceptive combinations of unrelated provisions at which the constitutional limitation on the scope of initiatives is aimed." (*California Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 360.) Section 8 "is located . . . near the middle of a 120 page document, and consists of two brief paragraphs which bear no connection to what precedes or follows." (*Ibid.*) "We believe it extremely unlikely that the average voter or signer of a sponsoring petition, or even one more conscientious and sophisticated, would take the time to study the initiative in such detail as to discover this obscure campaign funding provision." (*Id.* at p. 361.) "The significant threat that voters will be misled as to the breadth of the initiative is heightened by the absence of any reference to section 8 in the Attorney General's title and summary, or in the introductory statement of findings and purpose in the initiative itself, set forth in full above. In the present case, not only is there a lack of any reasonably discernible nexus between the stated object of the initiative and the campaign spending and conflict of interest provisions of section 8, but the title and various descriptions of the initiative's contents give no clue that any such provisions are buried within. These flaws are fatal." (*Ibid.*)

*California Trial Lawyers* is distinguishable in that section 8 had no discernable relationship to the other provisions of an

initiative aimed at controlling insurance costs. In contrast, the special tax treatment for cable companies under Proposition 39 is part of the overall funding mechanism for the clean energy job creation program. There also can be no comparison between the voter materials the voters on Proposition 39 received and those before voters in *California Trial Lawyers*. In that case, the offending provision was buried in the middle of a 120-page document, with no reference to it in the ballot materials or the initiative's prefatory language. In contrast, the challenged provision in Proposition 39 was located at the end of a four-and-a-half page document, and was specifically flagged in the Legislative Analyst's analysis.

Plaintiff argues, "Proposition 39 is a classic example of logrolling." Logrolling occurs when "certain groupings of voters, each constituting numerically a minority, but in aggregate a majority, may approve a measure which lacks genuine popular support in order to secure the benefit of one favored but isolated and severable provision." (*Brosnahan*, *supra*, 32 Cal.3d at p. 250.) Plaintiff contends Proposition 39 constitutes logrolling because it combined the special tax treatment for cable companies, a provision it theorizes was unlikely to garner popular support, with a more popular provision supporting clean energy job creation. Plaintiff argues, "The goal was to change the tax law; the [Job Creation Fund] w[as] merely [an] expedient[ ] to that end." Plaintiff's argument is not consistent with our high court's precedent.

*Kennedy Wholesale* expressly held that logrolling is not a separate basis to invalidate an initiative—rather, "[t]he single-subject rule is the method by which the state Constitution guards against that hazard." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at

24

p. 255.)[8] We have already explained that Proposition 39 does not violate the single-subject rule. Thus, calling inclusion of the lower tax rate for cable companies with $250 million in California expenditures "logrolling" does not alter what we have already concluded, that Proposition 39 passes constitutional muster under the single-subject rule.

Further, our Supreme Court has "rejected the contention that the single-subject rule requires a showing that each one of a measure's several provisions was capable of gaining voter approval independently of the other provisions." (*Brosnahan*, *supra*, 32 Cal.3d at p. 251.) As *Kennedy Wholesale* observed, "The possibility that some voters objected to some parts of a measure . . . 'is inherent in any initiative containing more than one sentence . . . . .' [Citation]." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 255.)

We can conceive of no amendment that would cure the defects in plaintiff's complaint, nor does plaintiff propose any. In sum, the trial court did not err in sustaining the demurrer without leave to amend.

---

[8] As noted above, in *Kennedy Wholesale,* the Supreme Court rejected the challenger's single-subject attack on an initiative that taxed tobacco products to fund a disparate range of causes even though some of the funds could be used to ameliorate conditions not caused by tobacco products. It did so even in the face of arguments that the breadth of causes qualifying for monies from the tobacco product tax was necessary to bring together " 'disparate interest groups' " presumably to support the initiative. (*Kennedy Wholesale, supra*, 53 Cal.3d at p. 255.)

25

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION.


BENDIX, Acting P. J.


We concur:



CHANEY, J.



WEINGART, J.

26